CALEB MARKER (SBN 269721)
 Email: caleb.marker@zimmreed.com
HANNAH P. BELKNAP (SBN 294155)
 Email: hannah.belknap@zimmreed.com
ZIMMERMAN REED, LLP
2381 Rosecrans Ave., Suite 328
Manhattan Beach, CA 90245
(877) 500-8780 Telephone
(877) 500-8781 Facsimile

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| B. AMBURGEY and ALICE WASHINGTON, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>CAREMARKPCS HEALTH, L.L.C., a Delaware limited liability company, and DOES 1-10, inclusive,<br><br>Defendants. | CASE NO.: 8:17–CV–183 CJC KES<br><br>*Assigned to Hon. Cormac J. Carney*<br><br>**FIRST AMENDED COMPLAINT (CLASS ACTION)**<br><br>(Jury Trial Demanded) |

Plaintiff B. Amburgey ("Plaintiff Amburgey" or "Amburgey") and Plaintiff Alice Washington ("Plaintiff Washington" or "Washington") (collectively, "Plaintiffs") bring this Amended Complaint ("Complaint") against Defendant CaremarkPCS Health, L.L.C., individually and on behalf of all others similarly situated, and allege as follows:

## NATURE OF THE CASE

1.      This is a consumer protection class action.  The prescription drugs at issue are Etanercept (hereinafter referred to by its trade name "Enbrel"), an expensive drug indicated for the treatment of five long-term inflammatory diseases, and all other refrigerated specialty drugs dispensed and shipped by Defendant CaremarkPCS Health, L.L.C. ("Specialty Drugs").  Enbrel, as well as at least several others of the Specialty Drugs, is manufactured by Immunex Corporation ("Immunex" or "Amgen").  Defendant CaremarkPCS Health, L.L.C. ("Defendant" or "Caremark"), a direct subsidiary and pharmacy benefit manager of CVS Health, fills, provides and ships prescription drugs to purchasers and consumers.  Enbrel must be stored and maintained between a temperature of 36 and 46 degrees Fahrenheit.  Although Caremark is keenly aware of the specific temperature requirements, during the filling, dispensing and shipping of Enbrel and other Specialty Drugs, Caremark does not have adequate policies and procedures in place to ensure that the Specialty Drugs are maintained within that drug's required temperature range during storage and distribution such that it reaches end users with quality intact.

2.      A complete list of the specialty drugs dispensed by Caremark's specialty pharmacies is attached as Exhibit 1.  As used herein, the term "Specialty Drugs" refers to all specialty drugs requiring refrigeration that are dispensed by Caremark's specialty pharmacies, including but not limited to the following:

       a.  Actimmune (interferon gamma 1B)
       b.  Avonex (interferon beta-1a)
       c.  Betaseron (interferon beta 1B)

d.  Copaxone (glatiramer)

e.  Enbrel (etanercept)

f.  Epogen (epoetin alfa)

g.  Genotropin (somatropin)

h.  Humatrope (somatropin)

i.  Humira (adalimumab)

j.  Infergen (interferon alfacon-1)

k.  Kaletra (lopinavir/ritonavir)

l.  Neulasta (pegfilgrastim)

m.  Neupogen (filgrastim)

n.  Norditropin (somatropin)

o.  Norvir (ritonavir)

p.  Procrit (epoetin alfa)

q.  Rapamune (sirolimus)

r.  Rebetol (ribavirin)

s.  Sandostatin (octreotide)

t.  Sandostatin LAR (octreotide)

3.   Through this class action, Plaintiffs challenge Caremark's unlawful and unfair business practices of (1) failing to store and distribute Specialty Drugs in the specified temperature ranges during transit between specialty pharmacies such as Caremark and the delivery address supplied by consumers; (2) failing to disclose that mail order pharmacies such as Caremark do not have adequate policies and procedures to ensure that the Specialty Drugs are maintained within the specified temperature range; (3) failing to disclose that Specialty Drugs shipped by specialty pharmacies such as Caremark may freeze during transit and no longer be suitable for use; (4) failing to disclose that Specialty Drugs shipped by specialty pharmacies such as Caremark may exceed the upper temperature limit and therefore (a) cannot be again refrigerated upon receipt and (b) may only suitable for use for a certain short number of days; and (5) failing to disclose that Specialty Drugs shipped by specialty pharmacies such as Caremark should be discarded for failing to meet FDA guidelines.

4.   Such unlawful, deceptive, and misleading business acts and practices violate the consumer protection laws of California, Pennsylvania and Wisconsin and

give rise to claims under California's Consumer Legal Remedies Act (Cal. Civ. Code § 1750 *et seq.*, hereinafter referred to as the "CLRA") and Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 *et seq.*, hereinafter referred to as the "UCL"), Pennsylvania's Unfair Trade Practices Act (73 P.S. § 201-1 *et seq.*, hereinafter referred to as the "Pennsylvania UTPA") and Wisconsin's Deceptive Trade Practices Act (Wis. Stat. § 100.18(1).3328., hereinafter referred to as the "Wisconsin DTPA"), among other laws.  This Complaint alleges violations of the CLRA and provisions of the California Health & Safety Code as predicate acts to establish violations of the UCL.

5.    Through this Complaint, Plaintiffs seek actual and statutory damages, restitution, declaratory, and injunctive relief, as specified herein.

## **PARTIES**

6.    Plaintiff Amburgey is an adult resident of Newport Beach, Orange County, California.  During the Class Period, Plaintiff Amburgey was prescribed and regularly took Enbrel.

7.    Plaintiff Washington is an adult resident of Brown Deer, Milwaukee County, Wisconsin.  During the Class Period, Plaintiff Washington was prescribed and regularly took Enbrel.

8.    Defendant CaremarkPCS Health, L.L.C. is, and at all times mentioned herein, was a Delaware limited liability company, with its principal place of business in Northbrook, Illinois.  Defendant's registered agent for service of process in California is CT Corporation System.  Within this District, Caremark operates a specialty pharmacy at 1127 Bryn Mawr Avenue, Redlands, California 92374.

9.    Plaintiffs do not know the true names and capacities of the defendants sued herein as Does 1 through 10 ("Doe Defendants"), inclusive, and therefore sues said Doe Defendants by fictitious names.  Plaintiffs are informed and believe and based thereon allege that each of the Doe Defendants is contractually, strictly, negligently, intentionally, vicariously liable and/or otherwise legally responsible in some manner for the acts and omissions described herein.  Plaintiffs will amend this Complaint to set

forth the true names and capacities of each Doe Defendant when the same are ascertained.

10.    Plaintiffs are informed and believe and based thereon allege that Defendants and Doe Defendants 1 through 10, inclusive, and each of them, are and at all material times have been, the agents, servants or employees of each other, purporting to act within the scope of said agency, service or employment in performing the acts and omitting to act as alleged herein.  Each of the Defendants named herein are believed to, and are alleged to, have been acting in concert with, as employee, agent, co-conspirator or member of a joint venture of, each of the other Defendants, and are therefore alleged to be jointly and severally liable for the claims set forth herein, except as otherwise alleged.

## JURISDICTION AND VENUE

11.    This Court has original jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one member of the Class is of diverse citizenship from Defendant, there are more than 100 members in the Class (defined *infra*), and the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs.

12.    This Court has personal jurisdiction over Defendant because Defendant conducts business in the State of California, a substantial portion of the wrongdoing alleged by Plaintiffs occurred in the State of California and this District, and Defendant has sufficient minimum contacts with and/or otherwise has purposefully availed itself of the markets of the State of California and this District such that it is fair and just for Defendant to adjudicate this dispute in this District.

13.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims occurred in this District and, as a corporation subject to personal jurisdiction in this District, Defendant conducts business in this District.

FIRST AMENDED COMPLAINT (CLASS ACTION)                                    4

# **FACTUAL ALLEGATIONS**

14.   Plaintiff Amburgey was diagnosed with severe rheumatoid arthritis in or around 2012 and was prescribed and began using Enbrel in or around January 2015.

15.   Plaintiff Amburgey's insurer, Anthem Blue Cross, requires her to obtain specialty drugs like Enbrel from Caremark's specialty pharmacy. Plaintiff Amburgey obtained Enbrel from Caremark's specialty pharmacy in Redlands, California throughout 2015.

16.   Plaintiff Washington was diagnosed with rheumatoid arthritis in or around 1992 and was prescribed and began using Enbrel in or around 2010.

17.   Plaintiff Washington's insurer, UnitedHealthcare, requires her to obtain specialty drugs like Enbrel from Caremark's specialty pharmacy.  Plaintiff Washington obtained Enbrel from Caremark's specialty pharmacy in Monroeville, Pennsylvania from approximately 2014 to the present.

18.   Enbrel is manufactured by Immunex Corporation, a subsidiary of Amgen, in Thousand Oaks, California.  Enbrel is Amgen's best-selling arthritis medicine and Enbrel is one of the top ten drugs in the United States by total sales.[1]

19.   In 2013, sales of Enbrel in the United States exceeded $4.2 billion dollars ($4,256,000,000).[2]  On information and belief, extrapolating based on the population size of California, sales in California accounted for about 12 percent of those sales, e.g. $511 million in California in 2013 alone.

20.   "Enbrel is a prescription medicine that can be self-injected. It is used to treat five long-term inflammatory diseases: moderate to severe rheumatoid arthritis (RA), adult chronic moderate to severe plaque psoriasis in patients who are candidates

---

[1]   *See*      http://www.bloomberg.com/news/2014-04-22/amgen-revenue-misses-analysts-estimates-on-enbrel-sales.html *;* http://www.drugs.com/stats/top100/sales (last visited Feb. 1, 2017).

[2]   Amgen   2013   Letter   to   Shareholders,   accessible   online   at http://investors.amgen.com/phoenix.zhtml?c=61656&p=irol-reportsannual (last visited Feb. 1, 2017).

for systemic therapy or phototherapy, psoriatic arthritis, moderate to severe juvenile idiopathic arthritis (JIA), and ankylosing spondylitis (AS)."[3]

21.     Enbrel is a biotech drug (or biologic), which means it is created inside a living cell culture. "Enbrel is a fusion protein, a molecule produced from recombinant DNA (rDNA)-a kind of molecular graft that combines multiple genetic properties like a horticultural graft joins vascular tissues. In the case of Enbrel, genetically-modified Chinese hamster ovary cells churn out the desired proteins."[4]

22.     Enbrel is offered in four varieties of injection options: (1) Enbrel® SureClick® 50-mg/mL autoinjector; (2) ENBREL single-use prefilled syringe; (3) ENBREL 25-mg multi-use vial free-hand method; and (4) ENBREL 25-mg vial adapter method.[5]

23.     Enbrel, like other specialty drugs, is an expensive drug, with an average monthly cost of $2,436 ($31,668 per year) for one of its varieties.[6]   The out-of-pocket cost for Enbrel can reach $50,000 per year.[7]

24.     According to Express-Scripts, despite their use by only 1-2% of the United States population, specialty drugs accounted for 37% of United States drug spending in 2015.[8]

25.     Plaintiff Amburgey's monthly co-pay for Enbrel was approximately $150.00 per 28-day supply.

---

[3]     *See* http://www.enbrel.com/what-is-ENBREL.jspx (last visited Feb. 1, 2017).
[4]     *See*         http://www.theatlantic.com/technology/archive/2013/06/enbrel-and-the-autoimmune-era/276911/ (last visited Feb. 1, 2017).
[5]     *See* http://www.enbrel.com/inject-ENBREL.jspx (last visited Feb. 1, 2017).
[6]     *See*         https://www.consumerreports.org/health/resources/pdf/best-buy-drugs/BBD_Rheumatoid_Arthritis_Summary.pdf (last visited Feb. 1, 2017).
[7]     *See* Alison Kodjak, Health Inc.: Specialty Drugs Can Prove Expensive Even With   Medicare   Coverage,   NPR,   December   3,   2015,   *available   at* http://www.npr.org/sections/health-shots/2015/12/03/458216778/specialty-drugs-can-prove-expensive-even-with-medicare-coverage.
[8]     *See*   https://lab.express-scripts.com/lab/drug-trend-report (last visited Feb. 1, 2017).

26.     Plaintiff Washington's monthly co-pay for Enbrel is, since January 1, 2017, approximately $1,000.00 per 28-day supply.  Prior to January 1, 2017, Plaintiff Washington's monthly co-pay for Enbrel was approximately $10.00 per 28-day supply. Washington's Plaintiff Washington, who is over the age of 65, is a Medicare beneficiary and supplements her healthcare costs through a Medicare Prescription Drug Coverage (Plan D) Plan.  Plaintiff Washington incurred out of pocket costs for Enbrel not covered by any medical insurance.

27.     Enbrel must be stored and maintained between a temperature of 36 and 46 degrees Fahrenheit.[9]  The following statement is prominently displayed on the top and on two sides of the Enbrel box:

"**Before and after reconstitution refrigerate at 2° to 8°C (36° to 46°F).**

**DO NOT FREEZE**" (emphasis in original).

28.     The same statement is included on each individual package within the box, and is found in various locations throughout the Medication Guide and Instructions For Use ("Medication Guide") pamphlet included in each box.

29.     Recently, the FDA approved instructions that allow for Enbrel to be stored at room temperature (68 to 77 degrees Fahrenheit) for up to 14 days.  Once Enbrel reaches room temperature, however, it may not be refrigerated again.

30.     The Medication Guide also instructs that a patient should "[t]hrow away Enbrel that has been stored at room temperature after 14 days."[10]

31.     There are no valid studies supporting the viability of Enbrel shipped outside of the FDA required temperature range of 36 and 46 degrees Fahrenheit.

---

[9]     *See* Manufacturer's Medication Guide, *available online at* http://pi.amgen.com/united_states/enbrel/derm/enbrel_mg.pdf (last visited Feb. 1, 2017).

[10]    *See id.*

32.     Several shipments of Enbrel that Plaintiff Amburgey received from Caremark arrived frozen.  Plaintiff Amburgey allowed the Enbrel to thaw and later injected herself with the Enbrel that had frozen.

33.     Caremark provides Enbrel to Plaintiffs and others in standard 28-day doses.

34.     Each shipping box Plaintiff Amburgey received from Caremark contained two boxes of Enbrel.  Each box of Enbrel contains four dose trays of Enbrel and is intended and required to be used for a 28-day period.

35.     Each shipping box Plaintiff Washington receives from Caremark contains one box of Enbrel.  Each box of Enbrel contains four Enbrel SureClick autoinjector and is intended and required to be used for a 28-day period.

36.     Despite only having obtained approval to store Enbrel at room temperature for 14 days, Immunex only manufactures, sells and distributes Enbrel in 28-day supplies.  As a result, if an entire shipment of Enbrel reaches room temperature, only half may be properly stored and used under FDA guidelines.

37.     Plaintiff Amburgey and her physician eventually determined that the Enbrel was not effectively treating her arthritis symptoms.

38.     At her physician's advice, Plaintiff Amburgey eventually discontinued use of Enbrel in or around December 2015 to try other medications.

39.     In 2016, Plaintiff Amburgey tried Celgene and later Orencia, without results.

40.     Plaintiff Amburgey later learned that she had an infection that was affecting her artificial knee replacement.

41.     Physicians informed Plaintiff Amburgey that she had likely had the infection for some time—including the time she was on Enbrel—without knowing it.

42.     Serious infections are a well-known side effect of Enbrel: "Infections, including serious infections, some fatal, have been observed in patients treated with

ENBREL. Discontinue ENBREL if a patient develops a serious infection or sepsis."
(https://www.enbrel.com/hcp/why-enbrel/safety-in-rheumatology/)

43.   Based on the advice of her physicians, Plaintiff Amburgey discontinued all medications and arranged to have two surgeries to replace her knee.

44.   In or around June 2016, Plaintiff Amburgey had surgery to add a spacer in her knee.  In or around August 2016, Plaintiff Amburgey had surgery to replace her knee.

45.   Plaintiff Amburgey's physicians have told her that she could and should resume use of Enbrel after one-year passes from her last surgery, which will be in or around August 2016.

46.   Plaintiff Amburgey plans to resume using Enbrel in or around August 2016 to attempt to alleviate her severe arthritis symptoms.

47.   A real estate agent by trade, Plaintiff Amburgey has recently been unable to work due to the pain associated with walking and moving around and plans to resume working if she is able to reduce the painful symptoms associated with her arthritis.

**Caremark's Common Course of Conduct**

48.   Caremark ships Enbrel and other Specialty Drugs to Plaintiffs and the Class according to a uniform policy.

49.   Caremark's practices or procedures for the preparation, dispensing, and/or shipment of Enbrel and other Specialty Drugs are inadequate, as they do not ensure that Enbrel and the other Specialty Drugs have remained within the specified temperature range.

50.   Caremark typically uses frozen and room temperature gel packs manufactured by Nordic Ice when shipping Specialty Drugs to consumers.

51.   Per a new policy started in or around May 2014, Caremark has placed a room temperature gel pack between the Specialty Drug boxes and the frozen gel packs, as it has with other Specialty Drugs.  Placement of a room temperature gel pack does

not guarantee or effectively ensure the temperature of the Enbrel and other Specialty Drugs.

52.     The outer packaging (e.g., the cardboard box) used to ship the Specialty Drugs contains affirmative misrepresentations, including:

    a.   The statement: "The melting of the cold pack can be expected during transit of your order" which represents that the Specialty Drug was shipped appropriately;

    b.   A logo of a penguin crossed out, which represents that the Specialty Drug has not been frozen and should not be frozen, as well as an instruction to keep the Specialty Drug refrigerated;

53.     Caremark includes a pre-printed notice in each Specialty Drug shipment that represents that its shipping procedure and/or process is "new and improved," "does even more" to keep Specialty Drugs cold, and exceeds "industry standards".  All of these affirmative misrepresentations are false.

54.     Caremark adds a "REFRIGERATED" label to each Specialty Drug package which serves to misrepresent that the Specialty Drug has been adequately refrigerated and that Plaintiffs and class members should place the Specialty Drug in a refrigerator despite the known temperature excursions.

55.     Caremark ships Enbrel to Plaintiffs and other class members using United Parcel Services ("UPS").  When a shipment is rejected because the customer is not home, the Specialty Drug is delivered via a number of express couriers, including, but not limited to, Golden State Same Day Couriers.  On information and belief, UPS and the express couriers that Caremark uses do not utilize temperature-controlled vehicles for transport of Enbrel and other Specialty Drugs to Plaintiff and other consumers.

56.     Caremark has never instructed Plaintiffs or the Class, in writing or otherwise, to verify the temperature of Enbrel or the other Specialty Drugs filled by its specialty pharmacies.

57.     Caremark has never provided or included a means by which Plaintiffs or the Class could monitor or verify the temperature of the Enbrel or other Specialty Drugs after they left Caremark's pharmacies.

58.     For example, Caremark could affix a disposable temperature indicator on Specialty Drug boxes or include a reusable temperature recorder, but does not.

59.     Disposable temperature indicators could be purchased from vendors such as 3M for a nominal cost.

60.     Caremark could ship Plaintiffs' Enbrel and other class members' Specialty Drugs to them through a courier that utilizes climate controlled delivery vehicles (such as those that distribute meat and grocery products).

61.     On information and belief, because the vehicles used to transport the Enbrel and other Specialty Drugs are not temperature controlled, the temperature of the Enbrel and other Specialty Drugs was much less than 32 degrees Fahrenheit at the time it left the shipping facility and remained at this below freezing temperature during transit, as it would have warmed during transit and upon removal from the packaging.

62.     The fact that the Enbrel and the other Specialty Drugs delivered to Plaintiffs and class members may have frozen is a material fact because Plaintiffs, reasonable consumers, would have acted differently, including, but not limited to: (1) purchasing a competing product instead of the Specialty Drugs; (2) selecting the Specialty Drugs from a different source; and/or (3) paying less for the Specialty Drugs. As such, Defendant has a duty to disclose said material information to Plaintiffs and other members of the Class.

63.     The fact that the Specialty Drugs delivered to Plaintiffs and class members may have been stored and/or shipped outside of the specified temperature range is a material fact because Plaintiffs, reasonable consumers, would have acted differently, including, but not limited to: (1) purchasing a competing product instead of a Specialty Drug; (2) selecting the Specialty Drug from a different source; and/or (3)

paying less for the Specialty Drug.  As such, Defendant has a duty to disclose said material information to Plaintiffs and other members of the Class.

64.    The fact that Defendant does not have adequate policies and procedures to store and distribute Specialty Drugs in the specified temperature range is a material fact because Plaintiffs, reasonable consumers, would have acted differently, including, but not limited to: (1) purchasing a competing product instead of a Specialty Drug; (2) selecting a Specialty Drug from a different source; and/or (3) paying less for the Specialty Drug.  As such, Defendant has a duty to disclose said material information to Plaintiffs and other members of the Class.

65.    Had Plaintiffs and other members of the Class been aware of any of the omitted information, they would not have purchased the Specialty Drugs or would have paid less money for the Specialty Drugs.  As such, Defendant caused Plaintiffs and other class members to suffer an economic injury.

66.    Like the Specialty Drugs, the smallpox vaccine must be kept between 36 and 46 degrees Fahrenheit and cannot be frozen.  The Centers for Disease Control ("CDC") publishes a Guide for Smallpox Vaccine Packing and Shipping ("Guide"). The guidelines are based in part on CDC's research on different shipping and handling methods under strenuous test conditions.

67.    The CDC also urges pharmacies to "consider including at least one heat indicator and one cold indicator in every box, with instructions on how to interpret them."  Guide, at 9.  Later, it notes that "temperature monitors should normally be used." Guide, at 11.

68.    The CDC also notes that it is important to establish a routine, systematic process. On information and belief, any policies and procedures Defendant purports to have with regard to packing and shipment of Specialty Drugs are inadequate and are not routine or systematic.

## **CLASS ALLEGATIONS**

69.     Plaintiffs bring this action on behalf of themselves and as a class action pursuant to the provisions of Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure.  Plaintiff Amburgey seeks to represent a class initially defined as:

> Any resident of the United States who obtained a Specialty Drug from a Caremark specialty pharmacy located in California during the Class Period (hereinafter, the "CA Pharmacy Class").

70.     Plaintiff Washington seeks to represent a class initially defined as:

> Any resident of the United States who obtained a Specialty Drug from a Caremark specialty pharmacy located in Pennsylvania during the Class Period (hereinafter, the "PA Pharmacy Class").

71.     Plaintiff Washington also seeks to represent a class initially defined as:

> Any resident of Wisconsin who obtained a Specialty Drug from a Caremark specialty pharmacy in the United States during the Class Period (hereinafter, the "Wisconsin Class").

Unless otherwise specified, as used throughout this Complaint, the term "Class" includes the three classes defined in paragraphs [69], [70] and [71] of this Complaint.

72.     The "Class Period" for the Class dates back four years (or the length of the longest applicable statute of limitations for any claim asserted) and continues through the present and the date of judgment.  Specifically excluded from the Class and Wisconsin Class are: (a) any officers, directors, or employees of Defendant; (b) any judge assigned to hear this case (or spouse or immediate family member of any assigned judge); (c) any employee of the Court; (d) any juror selected to hear this case; and (e) any attorneys of record and their employees.

73.     Plaintiffs reserve the right to modify, expand, or amend the above class definitions or seek certification of a class or subclasses that are defined differently than above before any court determines whether certification is appropriate following discovery.

74.   *Numerosity*.   Members of the Class are so numerous that joinder of all members is impracticable.   While the number of Class members is unknown to Plaintiffs at this time, Plaintiffs are informed and believe that the Class numbers at least in the thousands.

75.   *Ascertainability*.   The community of interest among the class members in the litigation is well defined and the proposed Class is ascertainable from objective criteria.   The identities of class members can be obtained from Defendant's business records.   Class members can be notified of the pendency of Plaintiffs' Complaint by mail or published notice.   If necessary to preserve the case as a class action, the Court can redefine the Class and/or create subclasses.

76.   *Commonality and Predominance*.   There is a well-defined community of interest in the questions of law and fact affecting the parties to be represented in this action.   Common questions of law and fact that exist as to all members of the Class and predominate over any questions affecting only individual members, include, but are not limited to:

   a.   Whether Caremark determined proper storage, handling and shipping practices for Specialty Drugs;

   b.   Whether Caremark failed to store and ship Specialty Drugs in the specified temperature range during transit between Caremark's specialty pharmacies and the delivery address supplied by consumers;

   c.   Whether Caremark's instructions to "Refrigerate Upon Receipt or Refrigerate Upon Opening" are false and misleading to consumers who may incorrectly assume that the temperature of the Specialty Drugs at the time of delivery is not relevant;

   d.   Whether Caremark's failure to disclose that it does not have adequate policies and procedures to ensure that the Specialty Drugs are maintained within the specified temperature range constitutes a material omission likely to deceive a consumer;

e.  Whether Caremark's failure to disclose that Specialty Drugs it ships may freeze during transit and no longer be suitable for use constitutes a material omission likely to deceive a consumer;

f.  Whether Caremark's failure to disclose that Specialty Drugs it ships may exceed the upper temperature limit and therefore (a) cannot be again refrigerated upon receipt and (b) are only suitable for use for a maximum of fourteen (14) days constitutes a material omission likely to deceive a consumer;

g.  Whether Caremark's failure to disclose that Specialty Drugs it ships should be discarded for failing to meet FDA guidelines constitutes a material omission likely to deceive a consumer;

h.  Whether Caremark violated Cal. Civ. Code § 1750 *et seq.* by making material omissions likely to deceive consumers, thereby making misrepresentations and untrue representations under Cal. Civ. Code § 1770(a);

i.  Whether Caremark violated Cal. Bus. & Prof. Code § 17200 *et seq.*;

j.  Whether Caremark violated the California Health & Safety Code;

k.  Whether Caremark violated 73 P.S. § 201-1 *et seq.*;

l.  Whether Caremark violated 13 Pa. Const. § 2314;

m. Whether Caremark violated Wis. Stat. § 100.18;

n.  Whether Caremark violated Wis. Stat. § 402.314; and

o.  Whether Plaintiffs and class members sustained injury and damages resulting from Caremark's conduct and, if so, the proper measure of statutory damages, declaratory and equitable relief, and the amount and nature of such relief.

77. *Typicality.*   Each Plaintiff's claims are typical of the claims of other members of the Class.  Typical of other class members, each Plaintiff's Specialty Drug prescription was filled, provided and shipped by Caremark.  Plaintiffs and the class

members each sustained damages arising from Caremark's common course of wrongful conduct, as alleged more fully herein.  Plaintiffs' claims are founded on the same legal theories as those of the Class.  The effort each Plaintiff undertakes to pursue her own claim will significantly benefit the class members because of the identical nature of the issues across the Class.

78.   *Adequacy of Representation*.  Each Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the other class members and because both Plaintiffs have retained counsel competent and experienced in complex class action and consumer litigation, including substantial experience in the types of claims alleged in this Complaint.  Plaintiffs and their counsel will fairly and adequately protect the interests of the Class.

79.   *Declaratory and Injunctive Relief*.  Caremark has acted or refused to act on grounds generally applicable to Plaintiffs and other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Class.

80.   *Superiority of Class Adjudication*.  The certification of a class in this action is superior to the litigation of a multitude of cases by members of the Class.  Class adjudication will conserve judicial resources and will avoid the possibility of inconsistent rulings.  Moreover, there are class members who are unlikely to join or bring an action due to, among other reasons, their reluctance to sue Defendant and/or their inability to afford a separate action.  Equity dictates that all persons who stand to benefit from the relief sought herein should be subject to the lawsuit and hence subject to an order spreading the costs of the litigation among the class members in relation to the benefits received.  The damages, restitution, and other potential recovery for each individual member of the Class are modest, relative to the substantial burden and expense of individual prosecution of these claims.  Given the amount of the individual class members' claims, few, if any, class members could afford to seek legal redress individually for the wrongs complained of herein.  Individualized litigation presents a

potential for inconsistent or contradictory judgments.   Individualized litigation increases the delay and expense to all parties and the court system presented by the complex legal and factual issues of the case.   By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

81.   In the alternative, the above-referenced Class may be certified because:

    a.   The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual class members' claims which would establish incompatible standards of conduct for Defendant;

    b.   The prosecution of separate actions by individual members of the Class would create a risk of adjudications which would as a practical matter be dispositive of the interests of other members of the class who are not parties to the adjudications, or which would substantially impair or impede the ability of other class members to protect their interests; and,

    c.   Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class.

## COUNT I

**Violation of the California Consumers Legal Remedies Act,**

**Cal. Civ. Code § 1750 *et seq.***

**(By Plaintiff Amburgey on Behalf of the CA Pharmacy Class)**

82.   Plaintiff Amburgey incorporates all preceding and succeeding allegations by reference as if fully set forth herein.

83.   Plaintiff Amburgey brings this claim individually and on behalf of the CA Pharmacy Class against Defendant.

84. In addition, Plaintiff Amburgey brings her request for injunctive relief on behalf of the general public.

85. This cause of action is brought pursuant to the California Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.* (the "CLRA").

86. Defendant's actions, representations and conduct have and continue to be subject to the CLRA because they extend to transactions that are intended to result, or that have resulted, in the sale of goods to consumers.

87. Plaintiff Amburgey and other members of the CA Pharmacy Class are "consumers" within the meaning of Cal. Civ. Code § 1761(d).

88. Defendant is a "person" as defined by Cal. Civ. Code § 1761(c).

89. Each of the Specialty Drugs is a "good" within the meaning of Cal. Civ. Code § 1761(a).

90. Plaintiff Amburgey and many other members of the CA Pharmacy Class are either "disabled persons" within the meaning of Cal. Civ. Code § 1761(g) or are "senior citizens" within the meaning of Cal. Civ. Code § 1761(f).

91. By engaging in the deceptive acts and practices set forth in this Complaint, Defendant violated, and continues to violate the CLRA in at least the following respects:

    a.    In violation of § 1770(a)(2), Defendant misrepresented the source, sponsorship, approval, or certification of the Specialty Drugs, as delivered by Defendant.

    b.    In violation of § 1770 (a)(5), Defendant represented that the Specialty Drugs, as delivered by Defendant, have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have.

    c.    In violation of § 1770 (a)(6), Defendant represented that the Specialty Drugs, as delivered by Defendant, are original or new though they have

deteriorated unreasonably or are altered, reconditioned, reclaimed, used, or secondhand.

d.   In violation of § 1770 (a)(7), Defendant represented that the Specialty Drugs, as delivered by Defendant, are of a particular style or model, though they are of another.

e.   In violation of § 1770 (a)(16), Defendant represented that the Specialty Drugs, as delivered by Defendant, have been supplied in accordance with previous representations when they have not.

92.   Had Caremark disclosed that the Specialty Drugs filled by mail order and delivered to Plaintiff Amburgey and members of the CA Pharmacy Class may not have been maintained at the specified temperature range of 36 and 46 degrees Fahrenheit during storage and delivery, Plaintiff Amburgey and members of the CA Pharmacy Class would have refused the delivery of the Specialty Drugs and/or would have paid less for the Specialty Drugs.

93.   Had Caremark included upper-limit and lower-limit (or a combination of the two) temperature indicators in the Specialty Drugs shipments it filled by mail order and delivered to Plaintiff Amburgey and members of the CA Pharmacy Class, Plaintiff Amburgey and members of the CA Pharmacy Class would not have purchased the Specialty Drugs, would have refused the delivery of the Specialty Drugs and/or would have paid less for the Specialty Drugs that were delivered outside of the specified temperature range.

94.   Had Caremark included a temperature recorder with the Specialty Drugs filled by mail order and delivered to Plaintiff Amburgey and members of the CA Pharmacy Class, Plaintiff Amburgey and members of the CA Pharmacy Class would not have purchased the Specialty Drugs, would have refused the delivery of the Specialty Drugs and/or would have paid less for the Specialty Drugs that were delivered outside of the specified temperature range.

95.     Had Plaintiff Amburgey and members of the CA Pharmacy Class known that the Specialty Drugs provided by Caremark's specialty pharmacies may have frozen during storage or shipment, they would have not have purchased the Specialty Drugs, would have refused the delivery of the Specialty Drugs and/or would have paid less for the Specialty Drugs.

96.     Had Plaintiff Amburgey and members of the CA Pharmacy Class known that the Specialty Drugs provided by Caremark's specialty pharmacies may have exceeded the upper limit of the specified temperature range of 36 and 46 degrees Fahrenheit during storage or shipment, they would have not have purchased the Specialty Drugs, would have refused the delivery of the Specialty Drugs and/or would have paid less for the Specialty Drugs.

97.     Had Plaintiff Amburgey and members of the CA Pharmacy Class known that the Specialty Drugs provided by Caremark's specialty pharmacies may exceed the upper limit of the specified temperature range of 36 and 46 degrees Fahrenheit during storage or shipment, they would have not have purchased the Specialty Drugs, would have refused the delivery of the Specialty Drugs and/or would have paid less for the Specialty Drugs.

98.     Had Caremark disclosed to Plaintiff Amburgey and members of the CA Pharmacy Class that it did not possess, utilize, or apply adequate policies and procedures to maintain specified temperature range of 36 and 46 degrees Fahrenheit during storage or mail order shipment, they would have not have purchased the Specialty Drugs, would have refused the delivery of the Specialty Drugs and/or would have paid less for the Specialty Drugs.

99.     Plaintiff Amburgey and members of the CA Pharmacy Class deem the disclosure of above-described information important in determining how to act in the transactions at issue.

100.     Defendant has a duty to disclose the above-described information to Plaintiff Amburgey and members of the CA Pharmacy Class.   Failure to provide such

information could result in significant health and safety risks to Plaintiff Amburgey and the CA Pharmacy Class, resulting in them injecting and/or using Specialty Drugs that are adulterated, misbranded, mutated, ineffective, or, at the very least, not approved for use due to health and safety concerns.  The Immunex-authored Enbrel Medication Guide (that "summarizes the most important information about Enbrel") warns:[11]

    a.    "Store Enbrel in the refrigerator at 36° to 46°F (2° to 8°C)";

    b.    "Once Enbrel has reached room temperature, do not put it back in the refrigerator";

    c.    "Throw away Enbrel that has been stored at room temperature after 14 days";

    d.    "Do not store Enbrel in extreme heat or cold. For example, avoid storing Enbrel in your vehicle's glove box or trunk"; and

    e.    "Do not freeze".

101.   Moreover, Defendant had exclusive actual knowledge, actively concealed and suppressed the above-described information that it was duty-bound to disclose. Plaintiff Amburgey and members of the CA Pharmacy Class have no independent means of obtaining said information.

102.   Defendant's acts and omissions constitute unfair, deceptive, and misleading business practices in violation of Cal. Civ. Code § 1770(a).

103.   Plaintiff Amburgey has suffered actual damages and injury, including but not limited to, pecuniary damages, as a result of Defendant's unfair, deceptive, and misleading business practices.

104.   Plaintiff Amburgey has complied with Cal. Civ. Code § 1782(a) by notifying Defendant in writing, by certified mail with return receipt requested (letter mailed Feb. 1, 2017 and received by Defendant on Feb. 6, 2017), of the violations

---

[11] http://pi.amgen.com/united_states/enbrel/derm/enbrel_mg.pdf.

alleged herein, and demanded that Defendant remedy and take corrective action.  As of the filing of this Complaint, the time for Defendant to respond has elapsed and, as Defendant has not responded or otherwise taken corrective action, Plaintiff Amburgey seeks recovery of actual and statutory damages through this Complaint.

105.   Plaintiff Amburgey, on behalf of herself and the CA Pharmacy Class, seeks:  (a) injunctive relief in the form of an order requiring Defendant to cease the acts of unfair competition alleged herein and to correct and/or enact adequate policies and procedures for filling, providing and shipment of the Specialty Drugs; (b) injunctive relief in the form of an order requiring Defendant to include a temperature indicator on the Specialty Drug boxes and/or include a reusable temperature recorder; and (c) the payment of attorney fees and costs pursuant to Cal. Civ. Code § 1780(e).

106.   In addition, Plaintiff Amburgey and members of the CA Pharmacy Class who are senior citizens (65 years of age or older) and/or disabled are further entitled to statutory damages of up to five thousand ($5,000) pursuant to Cal. Civ. Code § 1780(b) because they have suffered substantial physical, emotional, or economic damage resulting from Defendant Caremark's conduct and (1) Defendant knew or should have known that their conduct was directed to one or more persons who was a senior citizen and/or disabled; and/or (2) Defendant's conduct caused one or more senior citizen and/or disabled person to suffer: loss or encumbrance of a primary residence or source of income, or to suffer substantial loss of property set aside for retirement, or for personal or family care and maintenance, or substantial loss of assets essential to the health or welfare of the senior citizen and/or disabled person; and/or (3) Plaintiff  and the CA Pharmacy Class consist of one or more senior citizens and/or disabled persons who are substantially more vulnerable than other members of the public to Defendant's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and actually suffered substantial economic damage resulting from Defendant's conduct. *See* Cal. Civ. Code § 3345(b)(1)-(3).

## COUNT II

### Violation of Unfair Competition Law,

### Cal. Bus. & Prof. Code § 17200 *et seq.* – "Unlawful" Prong

### (By Plaintiff Amburgey on Behalf of the CA Pharmacy Class)

107.   Plaintiff Amburgey incorporates all preceding and succeeding allegations by reference as if fully set forth herein.

108.   Plaintiff Amburgey brings this claim individually and on behalf of the CA Pharmacy Class against Defendant.

109.   This cause of action is brought pursuant to California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* ("the UCL").

110.   Defendant engaged in unlawful, unfair, and/or fraudulent conduct under the UCL by concealing the material fact that it does not have adequate policies and procedures for filling, providing and shipment of Specialty Drugs to Plaintiff Amburgey and members of the CA Pharmacy Class.  Defendant knew or should have known that its omissions and affirmative misrepresentations were likely to deceive consumers.

111.   Defendant's conduct is unlawful in that it violates the CLRA.

112.   Defendant's actions and practices constitute "unlawful" business practices in violation of the UCL because, among other things, they violate the CLRA as detailed in Plaintiff Amburgey's first cause of action.

113.   Defendant's conduct is also unlawful in that it violates the California Health & Safety Code. *See, inter alia*, Cal. Health & Safety Code §§ 111255; 111260; 111280; 111285; 111290.

114.   Had Plaintiff Amburgey and members of the CA Pharmacy Class known that Defendant did not have adequate policies and procedures for packaging and shipment of the Specialty Drugs, they would not have purchased the Specialty Drugs from Defendant, and/or would have paid less for the Specialty Drugs.

115.   As a direct and proximate result of Defendant's violations, Plaintiff Amburgey and members of the CA Pharmacy Class have suffered and continue to suffer injury in fact and lose money or property as a result of Defendant's material omissions and affirmative misrepresentations.

116.   Plaintiff Amburgey, on behalf of herself and the CA Pharmacy Class, seeks:  (a) injunctive relief in the form of an order requiring Defendant to cease the acts of unfair competition alleged herein and to correct and/or enact adequate policies and procedures for filling, dispensing and shipping of Specialty Drugs; (b) injunctive relief in the form of an order requiring Defendant to include a temperature indicator on Specialty Drug boxes and/or include a reusable temperature recorder; (c) restitution; (d) declaratory relief; and (e) attorney fees and costs pursuant to Cal. Code Civ. P. § 1021.5, *inter alia*.

## COUNT III

### Violation of Unfair Competition Law,

### Cal. Bus. & Prof. Code § 17200 *et seq.* – "Fraudulent" Prong

### (By Plaintiff Amburgey on Behalf of the CA Pharmacy Class)

117.   Plaintiff Amburgey incorporates all preceding and succeeding allegations by reference as if fully set forth herein.

118.   Plaintiff Amburgey brings this claim individually and on behalf of the CA Pharmacy Class against Defendant.

119.   This cause of action is brought pursuant to California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* ("the UCL").

120.   Defendant engaged in unlawful, unfair, and/or fraudulent conduct under the UCL by concealing the material fact that it does not have adequate policies and procedures for filling, providing and shipment of Specialty Drugs to Plaintiff Amburgey and members of the CA Pharmacy Class.  Defendant knew or should have known that its omissions and affirmative misrepresentations were likely to deceive consumers.

121.   A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

122.   Defendant's business acts or practices of failing to disclose and actively concealing material information, as described herein, are fraudulent within the meaning of the UCL because they were likely to deceive and did deceive Plaintiff Amburgey and other members of the consuming public into believing that it had adequate policies and procedures to ensure that the Specialty Drugs were maintained, stored, dispensed and shipped at the specified temperature range and that the Specialty Drugs were not adulterated, misbranded, mutated, ineffective, or otherwise unapproved for use due to health and safety concerns, when in fact Caremark did not possess, utilize, or apply adequate policies and procedures to maintain specified temperature ranges of the Specialty Drugs during storage or mail order shipment.

123.   Had Caremark disclosed that the Specialty Drugs filled by mail order and delivered to Plaintiff Amburgey and members of the CA Pharmacy Class may not have been maintained at the specified temperature range of 36 and 46 degrees Fahrenheit during storage and delivery, Plaintiff Amburgey and members of the CA Pharmacy Class would have refused the delivery of the Specialty Drugs and/or would have paid less for the Specialty Drugs.

124.   Had Caremark included upper-limit and lower-limit (or a combination of the two) temperature indicators in the Specialty Drugs shipments it filled by mail order and delivered to Plaintiff Amburgey and members of the CA Pharmacy Class, Plaintiff Amburgey and members of the CA Pharmacy Class would not have purchased the Specialty Drugs, would have refused the delivery of the Specialty Drugs and/or would have paid less for the Specialty Drugs that were delivered outside of the specified temperature range.

125.   Had Caremark included a temperature recorder with the Specialty Drugs filled by mail order and delivered to Plaintiff Amburgey and members of the CA Pharmacy Class, Plaintiff Amburgey and members of the CA Pharmacy Class would

not have purchased the Specialty Drugs, would have refused the delivery of the Specialty Drugs and/or would have paid less for the Specialty Drugs that were delivered outside of the specified temperature range.

126.   Had Plaintiff Amburgey and members of the CA Pharmacy Class known that the Specialty Drugs provided by Caremark's specialty pharmacies may have frozen during storage or shipment, they would have not have purchased the Specialty Drugs, would have refused the delivery of the Specialty Drugs and/or would have paid less for the Specialty Drugs.

127.   Had Plaintiff Amburgey and members of the CA Pharmacy Class known that the Specialty Drugs provided by Caremark's specialty pharmacies may have exceeded the upper limit of the specified temperatures during storage or shipment, they would have not have purchased the Specialty Drugs, would have refused the delivery of the Specialty Drugs and/or would have paid less for the Specialty Drugs.

128.   Had Plaintiff Amburgey and members of the CA Pharmacy Class known that the Specialty Drugs provided by Caremark's specialty pharmacies may exceed the upper limit of the specified temperature ranges during storage or shipment, they would have not have purchased the Specialty Drugs, would have refused the delivery of the Specialty Drugs and/or would have paid less for the Specialty Drugs.

129.   Had Caremark disclosed to Plaintiff Amburgey and members of the CA Pharmacy Class that it did not possess, utilize, or apply adequate policies and procedures to maintain specified temperature ranges during storage or mail order shipment, they would have not have purchased the Specialty Drugs, would have refused the delivery of the Specialty Drugs and/or would have paid less for the Specialty Drugs.

130.   Plaintiff Amburgey and members of the CA Pharmacy Class deem the disclosure of above-described information important in determining how to act in the transactions at issue.

131. Defendant has a duty to disclose the above-described information to Plaintiff Amburgey and members of the CA Pharmacy Class.   Failure to provide such information could result in significant health and safety risks to Plaintiff Amburgey and the CA Pharmacy Class, resulting in them injecting and/or using Specialty Drugs that are adulterated, misbranded, mutated, ineffective, or, at the very least, not approved for use due to health and safety concerns.

132. Moreover, Defendant had exclusive actual knowledge, actively concealed and suppressed the above-described information that it was duty-bound to disclose. Plaintiff Amburgey and members of the CA Pharmacy Class have no independent means of obtaining said information.

133. As a result, consumers, including Plaintiff Amburgey, reasonably perceived and expected that the Specialty Drugs could be used as delivered and would be free from any health or safety risks.   This perception and expectation induced reasonable consumers, including Plaintiff Amburgey, to purchase Specialty Drugs from Caremark, which they otherwise would have not have purchased, for which they would have refused delivery and/or for which they would have paid less.

134. Defendant engaged in concealment designed to mislead Plaintiff Amburgey and other class members into believing that the Specialty Drugs were maintained, stored, dispensed and shipped at the specified temperature range and that the Specialty Drugs were not adulterated, misbranded, mutated, ineffective, or otherwise unapproved for use due to health and safety concerns.   As a result of Defendant's concealment and affirmative misrepresentations, Plaintiff Amburgey and other class members did not know, and could not know through the exercise of reasonably diligence, be expected to know, of the health and safety risks involved in their purchase and use of the Specialty Drugs, or of Defendant's fraudulent conduct.

135. Plaintiff Amburgey and other members of the CA Pharmacy Class relied on Defendant's omissions and affirmative misrepresentations in failing to disclose

material facts regarding the inadequate policies and procedures to maintain specified temperature ranges during storage or mail order shipment.

136.    As a direct and proximate result of Defendant's violations, Plaintiff Amburgey and members of the CA Pharmacy Class have suffered and continue to suffer injury in fact and lose money or property as a result of Defendant's material omissions and affirmative misrepresentations.

137.    Plaintiff Amburgey, on behalf of herself and the CA Pharmacy Class, seeks:  (a) injunctive relief in the form of an order requiring Defendant to cease the acts of unfair competition alleged herein and to correct and/or enact adequate policies and procedures for filling, dispensing and shipping of Specialty Drugs; (b) injunctive relief in the form of an order requiring Defendant to include a temperature indicator on Specialty Drug boxes and/or include a reusable temperature recorder; (c) restitution; (d) declaratory relief; and (e) attorney fees and costs pursuant to Cal. Code Civ. P. § 1021.5, *inter alia*.

## COUNT IV

### (Breach of Express Warranty)

### (By Plaintiff Amburgey on Behalf of the CA Pharmacy Class)

138.    Plaintiff Amburgey, on behalf of herself and the CA Pharmacy Class, incorporates by reference and re-allege the preceding paragraphs.

139.    Plaintiff Amburgey brings this claim individually and on behalf of the CA Pharmacy Class.

140.    Plaintiff Amburgey and each member of the CA Pharmacy Class formed a contract with Defendant at the time Plaintiff Amburgey and the other members of the CA Pharmacy Class purchased one or more of the Specialty Drugs. The terms of that contract include the promises and affirmations of fact made by Defendant on the packaging of the Specialty Drugs, as described above. The Specialty Drug packaging constitutes express warranties, became part of the basis of the bargain, and are part of a

standardized contract between Plaintiff Amburgey and the members of the CA Pharmacy Class on the one hand, and Defendant on the other.

141. All conditions precedent to Defendant's liability under this contract have been performed by Plaintiff Amburgey and the CA Pharmacy Class.

142. Defendant breached the terms of this contract, including the express warranties, with Plaintiff Amburgey and the CA Pharmacy Class by not providing the products that could provide the benefits promised, i.e., that Caremark's applicable shipping policies and procedures failed to maintain the Specialty Drugs at the required temperature range.

143. As a result of Defendant's breach of its contract, Plaintiff Amburgey and the CA Pharmacy Class have been damaged in the amount of the purchase price of any and all of the Specialty Drugs he or she purchased.

## COUNT V

**Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1 *et seq.***

**(By Plaintiff Washington on Behalf of the PA Pharmacy Class)**

144. Plaintiff Washington, on behalf of herself and the PA Pharmacy Class, incorporates by reference and re-allege the preceding paragraphs.

145. Plaintiff Washington brings this claim individually and on behalf of the PA Pharmacy Class against Defendant.

146. This cause of action is brought pursuant to Pennsylvania's Unfair Trade Practices Act, 73 P.S. § 201-1 *et seq.* ("Pennsylvania UTPA").

147. The Pennsylvania UTPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce..." 73 P.S. § 201-3.

148. Defendant, Plaintiff Washington and the PA Pharmacy Class are "persons" within the meaning of 73 P.S. § 201-2.(2).

149. Defendant is engaged in "trade" or "commerce" within the meaning of 73 P.S. § 201-2(3).

150.   In the course of Defendant's business, Defendant intentionally or negligently concealed and suppressed material facts concerning its failure to ensure that it maintained, stored, dispensed and shipped Enbrel at the specified temperature range and that the Specialty Drugs were not adulterated, misbranded, mutated, ineffective, or otherwise unapproved for use due to health and safety concerns. Defendant accomplished this by failing to disclose that it did not possess, utilize, or apply adequate policies and procedures to maintain specified temperature ranges during storage or mail order shipment.

151.   Plaintiff Washington and other members of the PA Pharmacy Class had no way of discerning, and could not, through the exercise of reasonably diligence, be expected to discern, the health and safety risks involved in their purchase and use of the Specialty Drugs, or of Defendant's fraudulent conduct.

152.   Defendant thus violated the provisions of the Pennsylvania UTPA, at a minimum by: (1) representing that the Specialty Drugs have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Specialty Drugs are of a particular standard, quality, and grade when they are not; (3) advertising the Specialty Drugs with the intent not to sell them as advertised; (4) failing to disclose information concerning the Specialty Drugs with the intent to induce consumers to purchase the Specialty Drugs.

153.   Defendant engaged in misleading, false, unfair or deceptive acts or practices that violated the Pennsylvania UTPA by failing to disclose and/or actively concealing and suppressing the above-described information that it was duty-bound to disclose.   Plaintiff Washington and members of the PA Pharmacy Class have no independent means of obtaining said information.

154.   Moreover, Defendant had exclusive actual knowledge, and knew that it did not possess, utilize, or apply adequate policies and procedures to maintain specified temperature ranges during storage or mail order shipment.

155.   Defendant intentionally and knowingly misrepresented material facts regarding the Specialty Drugs with the intent to mislead Plaintiff Washington and the PA Pharmacy Class.

156.   Defendant knew or should have known that its conduct violated the Pennsylvania UTPA.

157.   Defendant owed Plaintiff Washington and members of the PA Pharmacy Class a duty to disclose, truthfully, all the facts concerning the policies and procedures used to maintain specified temperature ranges during storage or mail order shipment of Specialty Drugs because they:

a.   Possessed exclusive knowledge that they were packing, storing, and shipping Specialty Drugs without possessing, utilizing, or applying adequate policies and procedures to maintain specified temperature;

b.   intentionally concealed the foregoing from Plaintiff Washington and PA Pharmacy Class Members; and/or

c.   made incomplete or negligent representations about the Specialty Drugs, while purposefully withholding material facts from Plaintiff Washington that contradicted these representations.

158.   Defendant engaged in concealment designed to mislead Plaintiff Washington and other members of the PA Pharmacy Class into believing that the Specialty Drugs were maintained, stored, dispensed and shipped at the specified temperature range and that the Specialty Drugs were not adulterated, misbranded, mutated, ineffective, or otherwise unapproved for use due to health and safety concerns.

159.   The fact that the Enbrel and the other Specialty Drugs delivered to Plaintiff Washington and the PA Pharmacy Class may have frozen, may have been stored and/or shipped outside of the specified temperature range, and that Defendant does not have adequate policies and procedures to store and distribute Specialty Drugs in the specified temperature range is material because Plaintiff Washington and

members of the PA Pharmacy Class.  A Specialty Drug that is kept within its specified temperature range is worth more than an otherwise comparable drug that is not.

160.   Defendant's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Washington and other members of the PA Pharmacy Class about the inadequate policies and procedures to maintain specified temperature ranges during storage or mail order shipment.

161.   Plaintiff Washington and other members of the PA Pharmacy Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's misrepresentations and its concealment of and failure to disclose material information.   Plaintiff Washington and the PA Pharmacy Class members who purchased the Specialty Drugs, would have acted differently, including, but not limited to: (1) purchasing a competing product instead of the Specialty Drugs; (2) selecting the Specialty Drugs from a different source; and/or (3) paying less for the Specialty Drugs.

162.   Defendant had an ongoing duty to Plaintiff Washington and the PA Pharmacy Class to refrain from unfair and deceptive practices under the Pennsylvania UTPA in the course of its business.

163.   Defendant's violations present a continuing risk to Plaintiff Washington and the PA Pharmacy Class, as well as to the general public.  Defendant's unlawful acts and practices complained of herein affect the public interest.

164.   Pursuant to 73 P.S. § 201-9.2(a), Plaintiff Washington and the PA Pharmacy Class seek and order enjoining Defendant's unfair and/or deceptive acts or practices, damages, and attorneys' fees, costs, and any other just and proper relief available under the Pennsylvania UTPA.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT VI

### Breach of Implied Warranty of Merchantability,

### 13 Pa. Const. Stat. § 2314

### (By Plaintiff Washington on Behalf of the PA Pharmacy Class)

165.   Plaintiff Washington, on behalf of herself and the PA Pharmacy Class, incorporates by reference and re-allege the preceding paragraphs.

166.   Plaintiff Washington brings this claim individually and on behalf of the PA Pharmacy Class against Defendant.

167.   Defendant is and was at all relevant times a "merchant" under 13 Pa. Const. Stat. § 2104, and a "seller" under 13 Pa. Cons. Stat. § 2103(a).

168.   The Specialty Drugs are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. § 2105(a).

169.   A warranty that the Specialty Drugs were in merchantable condition and fit for the ordinary purpose for which they are used is implied by law pursuant to 13 Pa. Cons. Stat. § 2314.

170.   These Specialty Drugs, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which drugs are used.

171.   Specifically, the Specialty Drugs are inherently defective in that they do not comply with the requirements specified by the FDA and the manufacturers for the Specialty Drugs.

172.   Defendant was provided notice of these issues by complaints filed against it including the instant Complaint, and by a letter sent by Plaintiff Washington on February 1, 2017 and received by Defendant on February 6, 2017.

173.   As a direct and proximate result of the Defendant's breach of the implied warranty of merchantability, Plaintiff Washington and the other PA Pharmacy Class members have been damaged in an amount to be proven at trial.

## COUNT VII

**Violations of the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18**

**(By Plaintiff Washington on Behalf of the Wisconsin Class)**

174.   Plaintiff Washington, on behalf of herself and the Wisconsin Class, incorporates by reference and re-allege the preceding paragraphs.

175.   Plaintiff Washington brings this claim individually and on behalf of the Wisconsin Class against Defendant.

176.   Plaintiff Washington and the Wisconsin Class members are members of "the public" within the meaning of Wis. Stat. § 100.18(1).   Plaintiff Washington and the Wisconsin Class members purchased Specialty Drugs.

177.   Plaintiff Washington and the Wisconsin Class members are "persons" under the Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA"), Wis. Stat. § 100.18(1).3328. Defendant is a "person, firm, corporation or association" within the meaning of Wis. Stat. § 100.18(1).

178.   The Wisconsin DTPA makes unlawful any "representation or statement of fact which is untrue, deceptive or misleading." Wis. Stat. § 100.18(1).

179.   In the course of Defendant's business, Defendant intentionally or negligently concealed and suppressed material facts concerning its failure to ensure that it maintained, stored, dispensed and shipped Enbrel at the specified temperature range and that the Specialty Drugs were not adulterated, misbranded, mutated, ineffective, or otherwise unapproved for use due to health and safety concerns. Defendant accomplished this by failing to disclose that it did not possess, utilize, or apply adequate policies and procedures to maintain specified temperature ranges during storage or mail order shipment.

FIRST AMENDED COMPLAINT (CLASS ACTION)                                    34

180.   Plaintiff Washington and other members of the Wisconsin Class had no way of discerning, and could not, through the exercise of reasonably diligence, be expected to discern, the health and safety risks involved in their purchase and use of the Specialty Drugs, or of Defendant's fraudulent conduct.

181.   Defendant thus violated the provisions of the Wisconsin DTPA, at a minimum by at a minimum by making myriad "representation[s] or statement[s] of fact which [are] untrue, deceptive or misleading" concerning the Specialty Drugs.

182.   In the course of Defendant's business, and in connection with consumer transactions, Defendant engaged in misleading, false, unfair or deceptive acts or practices that violated the Wisconsin DTPA by failing to disclose and/or actively concealing and suppressing the above-described information that it was duty-bound to disclose.   Plaintiff Washington and members of the Wisconsin Class have no independent means of obtaining said information.

183.   Moreover, Defendant had exclusive actual knowledge, and knew that it did not possess, utilize, or apply adequate policies and procedures to maintain specified temperature ranges during storage or mail order shipment.

184.   Defendant intentionally and knowingly misrepresented material facts regarding the Specialty Drugs with the intent to mislead Plaintiff Washington and the Wisconsin Class.

185.   Defendant knew or should have known that its conduct violated the Wisconsin DTPA.

186.   Defendant owed Plaintiff Washington and members of the Wisconsin Class a duty to disclose, truthfully, all the facts concerning the policies and procedures used to maintain specified temperature ranges during storage or mail order shipment of Specialty Drugs because they:

      a.     Possessed exclusive knowledge that they were packing, storing, and shipping Specialty Drugs without possessing, utilizing, or applying adequate policies and procedures to maintain specified temperature;

b.      intentionally concealed the foregoing from Plaintiff Washington and Wisconsin Class members; and/or

c.      made incomplete or negligent representations about the Specialty Drugs, while purposefully withholding material facts from Plaintiff Washington that contradicted these representations.

187.   Defendant engaged in concealment designed to mislead Plaintiff Washington and other members of the Wisconsin Class into believing that the Specialty Drugs were maintained, stored, dispensed and shipped at the specified temperature range and that the Specialty Drugs were not adulterated, misbranded, mutated, ineffective, or otherwise unapproved for use due to health and safety concerns.

188.   The fact that the Enbrel and the other Specialty Drugs delivered to Plaintiff Washington and the Wisconsin Class may have frozen, may have been stored and/or shipped outside of the specified temperature range, and that Defendant does not have adequate policies and procedures to store and distribute Specialty Drugs in the specified temperature range is material because Plaintiff Washington and members of the Wisconsin Class.  A Specialty Drug that is kept within its specified temperature range is worth more than an otherwise comparable drug that is not.

189.   Defendant's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Washington and other members of the Wisconsin Class about the inadequate policies and procedures to maintain specified temperature ranges during storage or mail order shipment.

190.   Plaintiff Washington and other members of the Wisconsin Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's misrepresentations and its concealment of and failure to disclose material information. Plaintiff Washington and the PA Pharmacy Class members who purchased the Specialty Drugs, would have acted differently, including, but not limited to: (1)

purchasing a competing product instead of the Specialty Drugs; (2) selecting the Specialty Drugs from a different source; and/or (3) paying less for the Specialty Drugs.

191.   Defendant had an ongoing duty to Plaintiff Washington and the Wisconsin Class to refrain from unfair and deceptive practices under the Wisconsin DTPA in the course of its business.

192.   Defendant's violations present a continuing risk to Plaintiff Washington and the Wisconsin, as well as to the general public.  Defendant's unlawful acts and practices complained of herein affect the public interest.

193.   Plaintiff Washington and the Wisconsin Class seek damages, court costs and attorneys' fees under Wis. Stat. § 100.18(11)(b)(2), and any other just and proper relief available under the Wisconsin DTPA.

**<u>COUNT VIII</u>**

**Breach of Implied Warranty of Merchantability,**

**Wis. Stat. § 402.314**

**(By Plaintiff Washington on Behalf of the Wisconsin Class)**

194.   Plaintiff Washington, on behalf of herself and the Wisconsin Class, incorporates by reference and re-allege the preceding paragraphs.

195.   Plaintiff Washington brings this claim individually and on behalf of the Wisconsin Class against Defendant.

196.   Defendant is and was at all relevant times a "merchant" under Wis. Stat. § 402.104(3) and a "seller" under § 402.103(1)(d).

197.   The Specialty Drugs are and were at all relevant times "goods" within the meaning of Wis. Stat. § 105(1)(c).

198.   A warranty that the Specialty Drugs were in merchantable condition and fit for the ordinary purpose for which they are used is implied by law pursuant to Wis. Stat. § 402.314.

199.   These Specialty Drugs, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which drugs are used.

200.   Specifically, the Specialty Drugs are inherently defective in that they do not comply with the requirements specified by the FDA and the manufacturers for the Specialty Drugs.

201.   Defendant was provided notice of these issues by complaints filed against it including the instant Complaint, and by a letter sent by Plaintiff Washington on February 1, 2017 and received by Defendant on February 6, 2017.

202.   As a direct and proximate result of the Defendant's breach of the implied warranty of merchantability, Plaintiff Washington and the other Wisconsin Class members have been damaged in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

Plaintiffs, on behalf of themselves and the Class, pray for relief as follows:

1.   For an order certifying that the action may be maintained as a class action and appointing Plaintiffs and their undersigned counsel to represent the Class in this litigation;

2.   For an order declaring that the acts and practices of Defendant constitute violations of Cal. Bus. & Prof. Code § 17200 *et seq.*, Cal. Civ. Code § 1750 *et seq.*, 73 P.S. § 201-1 *et seq.*, and Wis. Stat. § 100.18;

3.   For actual and statutory damages;

4.   For restitution;

5.   For a permanent injunction enjoining Defendant from continuing to harm Plaintiffs and members of the Class and the public, and violating California, Pennsylvania and Wisconsin law in the manners described above;

6.   For reasonable attorneys' fees and the costs of the suit; and

7.   For all such other relief as this Court may deem just and proper and may be available at law or equity.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand trial by jury of all claims so triable.

ZIMMERMAN REED, LLP

Dated: March 9, 2017          By:     /s/ Caleb Marker
                                       Caleb Marker
                                       caleb.marker@zimmreed.com
                                       Hannah P. Belknap
                                       hannah.belknap@zimmreed.com
                                       2381 Rosecrans Ave., Suite 328
                                       Manhattan Beach, CA 90245
                                       Tel. (877) 500-8780
                                       Fax (877) 500-8781

                                       *Attorneys for Plaintiffs*

## **AFFIDAVIT OF CALEB MARKER**

I, Caleb Marker, declare as follows:

1.     I am an attorney with the law firm Zimmerman Reed, LLP and am one of the attorneys representing Plaintiff B. Amburgey in this action.  This declaration is made pursuant to California Civil Code section 1780(d).  I make this declaration based on my research of public records and also upon personal knowledge and, if called upon to do so, could and would testify competently thereto.

2.     Based on my research of public records and personal knowledge, Defendant CaremarkPCS Health, L.L.C. conducts business within this Judicial District, operating a specialty pharmacy at 1127 Bryn Mawr Avenue, Redlands, California 92374.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 2nd day of February 2017.

/s/ Caleb Marker
Caleb Marker