CALEB MARKER (SBN 269721)
 Email: caleb.marker@zimmreed.com
ZIMMERMAN REED, LLP
2381 Rosecrans Ave., Suite 328
Manhattan Beach, CA 90245
(877) 500-8780 Telephone
(877) 500-8781 Facsimile

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SOUTHERN DIVISION

| | |
|---|---|
| B. AMBURGEY and ALICE WASHINGTON, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>  vs.<br><br>CAREMARKPCS HEALTH, L.L.C., a Delaware limited liability company, and DOES 1-10, inclusive,<br><br>        Defendants. | CASE NO.: 8:17–CV–183 CJC KES<br><br>*Assigned to Hon. Cormac J. Carney*<br><br>**THIRD AMENDED COMPLAINT (CLASS ACTION)**<br><br>(Jury Trial Demanded) |

Plaintiff B. Amburgey ("Plaintiff Amburgey" or "Amburgey") and Plaintiff Alice Washington ("Plaintiff Washington" or "Washington") (collectively, "Plaintiffs") bring this Amended Complaint ("Complaint") against Defendant CaremarkPCS Health, L.L.C., individually and on behalf of all others similarly situated, and allege as follows:

## NATURE OF THE CASE

1.      This is a consumer protection class action seeking damages and other relief as a result of Defendant's sale and distribution of adulterated drugs which were not lawfully sold.   The prescription drugs at issue are temperature sensitive, refrigerated specialty drugs dispensed and shipped by Defendant CaremarkPCS Health, L.L.C. ("Specialty Drugs").   Enbrel, as well as at least several others of the Specialty Drugs, are manufactured by Immunex Corporation ("Immunex" or "Amgen"). Defendant CaremarkPCS Health, L.L.C. ("Defendant" or "Caremark"), a direct subsidiary and pharmacy benefit manager of CVS Health, fills, dispenses, and ships prescription drugs to consumers.   The Specialty Drugs at issue here must be stored and maintained between a temperature of 36 and 46° F (2 - 8° C) to ensure their safety and efficacy.   Caremark is responsible for maintaining the Specialty Drugs within the required temperature range, yet during the filling, dispensing and shipping of Specialty Drugs, Caremark's policies and procedures are wholly inadequate and the required temperature range is exceeded and violated, leaving Plaintiff and the Class with adulterated drugs which cannot be lawfully sold in California.   Such drugs lack any value and therefore, restitution and other relief is due to each class member.

2.      Through this class action, Plaintiffs challenge Caremark's unlawful and unfair business practices of (1) failing to maintain the Specialty Drugs within the specified temperature range during storage and transit;   (2) failing to disclose that Caremark does not have adequate policies and procedures to ensure that the Specialty Drugs are maintained within the mandatory temperature range; (3) failing to disclose that Specialty Drugs shipped by Caremark may have frozen during transit and are no

longer be suitable for use; (4) failing to disclose that Specialty Drugs shipped by Caremark may have exceeded the upper temperature limit and therefore (a) cannot be re-refrigerated by the patient and (b) may only be suitable for use for a certain short number of days; and (5) failing to disclose that Specialty Drugs shipped by Caremark should be discarded for failing to meet manufacturer and Food and Drug Administration ("FDA") guidelines.

3.      "A specialty medication is defined by Medicare as any drug that costs more than $600 a month. Such drugs typically require special handling like refrigeration or additional supplies like syringes."[1]

4.      The two Specialty Drugs at issue in this matter, Orencia and Enbrel, must be maintained at all times between 36 – 46° F (2–8° C) during transport from the factory to patients, and cannot be frozen.  These requirements are imposed by the FDA and the manufacturers to ensure the drugs' safety and efficacy. In the event that violations of these requirements occur, i.e. "temperature excursions," the drugs must not reach patients, and the manufacturer must be notified.  Such drugs which exceed the permitted temperature ranges are adulterated, cannot be lawfully sold in California and are valueless.  Consumers, like Plaintiff and the members of the Class who purchased them, directly and/or indirectly, have been injured financially and suffered an out-of-pocket loss.

5.      While seemingly straightforward, keeping liquids like the Specialty Drugs at issue within the required temperature range poses significant engineering challenges to manufacturers and distributors. Developing an adequate cold chain logistics system requires specialized knowledge and rigorous quality assurance testing. Further, effective temperature maintenance often requires relatively expensive packaging and shipping materials, such as insulated boxes, temperature sensors, and pounds of cooling packs.

---

[1] http://www.pbs.org/newshour/updates/can-patients-address-rising-cost-specialty-medication/

1473896_1

6.      Accordingly, designing cold chains is the realm of experts with backgrounds in mathematics, science, and engineering.  While inexpensive, low-tech shipping solutions may be acceptable for low-cost consumer goods with tolerable loss ratios, they are inappropriate in the world of Specialty Drugs. Drug makers invest in sophisticated cold chains to maintain their Specialty Drugs at appropriate temperatures.

7.      Caremark is the largest vender in the Specialty Drug market in the United States, generating $20.5 billion in specialty pharmacy revenue in 2014, which represented 26% of the total market.

8.      Shockingly, however, Caremark's cold chain is not the product of specialized knowledge and rigorous testing. Instead, Caremark's cold chain was designed by employees with no relevant education or experience whatsoever, and overseen by other employees who lacked the wherewithal to notice and correct extremely basic mistakes.

9.      Caremark's practices were deficient at all stages. To start with, the cut-rate packaging Caremark uses for the Specialty Drugs at issue is insufficiently insulated to maintain the drugs' temperature for more than a couple hours. This is simply inadequate given that it takes far longer than that for drugs to travel from Caremark's specialty pharmacies to patients. As a result, all or nearly all shipments will reach outside ambient temperatures at some point prior to arrival.

10.     While Caremark could theoretically use cooling packs to compensate for the poor thermal performance of the boxes, here too Caremark falls short. To keep costs and shipping weight down, Caremark has opted to use cooling packs that have insufficient mass to maintain the correct temperature.

11.     Additionally, for several years Caremark's cooling packs were chilled to a temperature that was too cold. This occurred because Caremark's employees transposed Celsius and Fahrenheit in the protocols for the refrigerators at Caremark's distribution centers. As a result of this common error affecting all class members' prescriptions, gel packs were too cold when they were placed in the packaging,

resulting in the flash freezing of the Specialty Drugs.  In turn, the efficacy of the drugs Plaintiff and the Class purchased was compromised as the required temperature range was violated.

12.   The deficiencies in Caremark's practices went undiscovered for years, and largely continue to this day, because Caremark has failed to conduct any testing to verify the efficacy of its procedures.

13.   As a result, all or nearly all shipments of Specialty Drugs shipped by Caremark during the Class Period ride a temperature roller coaster. They may be initially frozen by too-cold gel packs (in blatant violation of FDA and manufacturer requirements), and then reach outside ambient temperatures well above the 46° F maximum during transit.

14.   Many insurers now require consumers to obtain their drugs from mail-order specialty pharmacies like those operated by Caremark.  *The New York Times* noted the following four years ago:

> In one study inspired by patient stories about mail order asthma medications that had shown up looking degraded and in damaged packaging, researchers at the Carl Hayden Veterans Affairs Medical Center in Phoenix exposed packages of Formoterol, a commonly used asthma drug, to different conditions for four-hour periods. Some simulated temperatures inside mailboxes in the Southwest, which can climb to over 158 degrees Fahrenheit.

> When the mercury reached 158 degrees or higher, the medication clumped and the capsules became distorted, and the authors noted a "significant decline" in the drug's potency. They cautioned that people should be aware of other situations where medication can be exposed to extreme heat, "like car trunks and interiors."[2]

15.   Caremark eschews same-day courier delivery in favor of less expensive overnight shipping.

---

[3]   The trial court in *In re Steroid Hormone* held that the plaintiff lost money by virtue of purchasing a product (drugs that could not be lawfully sold under the provisions of the Health & Safety Code, as here) that had no value or at minimum, was of diminished value, stating: "The court knows of no principled way to place a monetary value on the legal status of a product and defendant suggests none.  The court declines defendant's implicit invitation to find that an illegal sales confers as much value as a legal sale of the same product."

16.     The scientists who developed the Specialty Drugs proposed the 36-46° F storage temperature requirement – the requirement that was subsequently approved and mandated by the FDA. The Specialty Drugs' developers and manufacturers will not and cannot guarantee the Specialty Drugs' stability or efficacy outside that temperature range, and for good reason: Enbrel and Orencia, the drugs at issue here, are comprised of living protein molecules, and are thus vulnerable to thermal stresses.

17.     The thermal stress resulting from exposure to temperatures outside the FDA-approved range harms the Enbrel and Orencia molecules in a number of ways. For example, protein aggregation occurs after freeze-thaw cycles, and after exposure to warm temperatures.  Protein aggregation is a biological phenomenon in which proteins accumulate and clump together, reducing the number of Enbrel or Orencia molecules (and their associated TNF receptors) left to bind to TNF molecules.   Thus, defective storage and transportation procedures (such as Caremark's, where the 36-46° F storage temperature requirement are routinely violated) exposes Enbrel and Orencia to stresses that cause aggregation, and reduce the amount of effective medication in a given dose relative to unadulterated shipments.

18.     Enbrel and Orencia are dose-dependent pharmaceuticals, meaning that their effectiveness (i.e., their ability to treat arthritic or other symptoms) depends on the size of the administered dose. Accordingly, Enbrel and Orencia are less effective when the dose is reduced, such as by protein aggregation resulting from temperature excursions.

19.     By knowledge and belief, when physicians prescribe Enbrel and Orencia they assume that the drug will be shipped and stored properly, in accordance with the temperature range requirements at all times, and calculate dosages accordingly.

20.     The Specialty Drugs dispensed by Caremark's specialty pharmacies are adulterated and less effective than equivalent shipments maintained within the 36-46° F range approved by the FDA.  By "less effective", Plaintiffs contend that the adulterated Specialty Drugs dispensed by Caremark are less effective in treating the

symptoms associated with the prescribed indications, ailments, afflictions, illnesses, and/or conditions (such as rheumatoid arthritis), which causes arthritic flare ups and pain and suffering.

21.    The adulterated Specialty Drugs at issue in this case are less valuable than the unadulterated versions of the same Specialty Drugs. As described herein, the adulterated Specialty Drugs, Enbrel and Orencia, purchased by Plaintiffs and the Class were worth less than the products they believed that they were purchasing, i.e., Specialty Drugs free of storage and transportation defects. Unadulterated Specialty Drugs are more stable, have greater efficacy, and carry less risk. *See e.g. Plubell v. Merck & Co.,* 289 S.W.3d 707, 711 (Mo. Ct. App. 2009).

22.    No reasonable consumer would purchase adulterated Specialty Drugs because, among other things, they are unlawful to possess, have no value, are less effective, and pose serious and fatal side effects with little to no upside.   The adulterated Specialty Drugs sold by Caremark are worth less than unadulterated Specialty Drugs for many reasons, including the following:

a.  First, possession of adulterated medication is a criminal offense, and reasonable consumers would not expose themselves to potential criminal liability by purchasing or possessing an unlawful drug.  *See e.g. In re Steroid Hormone Prod. Cases*, 181 Cal. App. 4th 145, 157, 104 Cal. Rptr. 3d 329, 339 (2010), *as modified on denial of reh'g* (Feb. 8, 2010) ("Thus, the question that must be answered in this case is whether a reasonable person would find it important when determining whether to purchase a product that it is unlawful to sell or possess that product. It requires no stretch to conclude that the proper answer is 'yes' — we assume that a reasonable person would not knowingly commit a criminal act.").

b.  Second, adulterated Specialty Drugs cannot be sold, dispensed, or even possessed and therefore have no value as a matter of law. *In re Steroid Hormone*, 181 Cal. App. 4th at 160 ("[I]n this case [plaintiff] does not put

valuation at issue when he alleges that he bought a product that was illegal to sell or possess.").[3]

c. Third, the adulterated Specialty Drugs at issue are less effective than their unadulterated counterparts. The adulterated Specialty Drugs' chemical structures have been altered, reducing how many TNF molecules they can bind with. Accordingly, the adulterated Specialty drugs are less effective at treating rheumatoid arthritis in that (1) they relieve less pain; (2) cause flare-ups; and (3), fail to stem the disease's progression.

d. Fourth, even when stored perfectly the Specialty Drugs carry with them a number of serious, even fatal, side effects. The decision to take Specialty Drugs is not an easy one for patients, and requires a careful balancing of risks and benefits. Accordingly, no reasonable person would risk subjecting themselves to Specialty Drugs that were stored and transported improperly and had questionable or reduced efficacy.  A reasonable person would either obtain the Specialty Drugs from a distributor that maintained the Specialty Drugs correctly and without deviation from the manufacturer's 36-46° F storage temperature requirement, or forego using the Specialty Drugs at all.  *See e.g. Plubell v. Merck & Co.,* 289 S.W.3d 707, 711 (Mo. Ct. App. 2009).

23.    Caremark represented that the adulterated Enbrel and Orencia purchased by Plaintiffs and the Class was properly maintained, and actively concealed its deficient practices. Consequently, the Specialty Drugs were worth less than the products Plaintiffs and the Class believed that they were purchasing, i.e., Specialty

---

[3]    The trial court in *In re Steroid Hormone* held that the plaintiff lost money by virtue of purchasing a product (drugs that could not be lawfully sold under the provisions of the Health & Safety Code, as here) that had no value or at minimum, was of diminished value, stating: "The court knows of no principled way to place a monetary value on the legal status of a product and defendant suggests none.  The court declines defendant's implicit invitation to find that an illegal sales confers as much value as a legal sale of the same product."

1  Drugs free of storage and transportation defects that reduced the Specialty Drugs'
2  stability and efficacy. *See e.g. Plubell*, 289 S.W.3d at 711.

3       24.    In addition to the economic injury and out-of-pocket damages Plaintiffs
4  and the Class suffered from purchasing adulterated Specialty Drugs they otherwise
5  would not have purchased, Plaintiffs Amburgey and Washington suffered personal
6  injuries from taking the adulterated Specialty Drugs.

7       25.    The adulterated Specialty Drugs dispensed by Caremark personally
8  injured Plaintiff Amburgey. The adulterated Enbrel and Orencia dispensed by
9  Caremark and injected into Plaintiff Amburgey was less effective than Enbrel
10 maintained within the approved the 36-46° F temperature range.  The adulterated
11 Enbrel and Orencia was less effective in reducing the symptoms of Plaintiff
12 Amburgey's arthritis and preventing the disease's progression, and therefore caused
13 her to experience arthritic flare ups after she was injected with Enbrel and Orencia.
14 When an arthritic flare up occurred, Plaintiff Amburgey experienced joint pain, joint
15 swelling, stiffness, and fatigue, among other symptoms, often to a debilitating level.

16      26.    The adulterated Specialty Drugs dispensed by Caremark reduced Plaintiff
17 Amburgey's immune system, and resulted in a joint infection that required two
18 surgeries. In addition to the flare ups, the adulterated Enbrel and Orencia administered
19 to Plaintiff Amburgey resulted in an infection in the area around her artificial joint.
20 This infection was accompanied by significant pain and suffering, economic damages,
21 and two additional joint surgeries.

22      27.    Had Plaintiff Amburgey known that the Enbrel and Orencia dispensed by
23 Caremark had not been maintained within the 36-46° F temperature range approved by
24 the FDA, she would not have ordered said prescriptions, nor would she have injected
25 or directed that said prescriptions be injected into her body.

26      28.    The Adulterated Specialty Drugs dispensed by Caremark personally
27 injured Plaintiff Washington. The adulterated Enbrel dispensed by Caremark and
28 injected into Plaintiff Washington was less effective than unadulterated Enbrel kept

within the 36-46° F temperature range approved by the FDA.  The adulterated Enbrel was less effective in reducing the symptoms of Plaintiff Washington's arthritis and therefore caused her to experience arthritic flare ups after she was injected with Enbrel. When an arthritic flare up occurred, Plaintiff Washington experienced joint pain, joint swelling, stiffness, and fatigue, among other symptoms, often to a debilitating level. It was also less effective in preventing the disease's progression.

29.    Such unlawful, deceptive, and misleading business acts and practices violate the consumer protection laws of California and Wisconsin and give rise to claims under California's Consumer Legal Remedies Act (Cal. Civ. Code § 1750 *et seq.*, hereinafter referred to as the "CLRA") and Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 *et seq.*, hereinafter referred to as the "UCL"),  and Wisconsin's Deceptive Trade Practices Act (Wis. Stat. § 100.18(1).3328., hereinafter referred to as the "Wisconsin DTPA"), among other laws.  This Complaint alleges violations of the CLRA and provisions of the California Health & Safety Code as predicate acts to establish violations of the UCL.

30.    Through this Complaint, Plaintiffs seek actual and statutory damages, restitution, declaratory, and injunctive relief, as specified herein.

## **PARTIES**

31.    Plaintiff Amburgey is an adult resident of Newport Beach, Orange County, California.  During the Class Period, Plaintiff Amburgey was prescribed and regularly took Enbrel and Orencia.

32.    Plaintiff Washington is an adult resident of Brown Deer, Milwaukee County, Wisconsin.  During the Class Period, Plaintiff Washington was prescribed and regularly took Enbrel.

33.    Plaintiffs Amburgey and Washington were both injected with adulterated Specialty Drugs that were stored and transported pursuant to Caremark's common procedures and protocols.  These common procedures and protocols contain uniform defects that resulted in the Specialty Drugs not being kept at the FDA-approved

temperature range, resulting in the drugs' adulteration and a reduction in their efficacy in treating arthritis compared to unadulterated Specialty Drugs stored within the correct temperature range.  As a result, Plaintiffs Amburgey and Washington both suffered arthritic flare-ups as described above and suffered personal injuries.

34.     Defendant CaremarkPCS Health, L.L.C. is, and at all times mentioned herein, was a Delaware limited liability company, with its principal place of business in Northbrook, Illinois.   Defendant's registered agent for service of process in California is CT Corporation System.   Within this District, Caremark operates a specialty pharmacy at 1127 Bryn Mawr Avenue, Redlands, California 92374.

35.     Plaintiffs do not know the true names and capacities of the defendants sued herein as Does 1 through 10 ("Doe Defendants"), inclusive, and therefore sues said Doe Defendants by fictitious names.  Plaintiffs are informed and believe and based thereon allege that each of the Doe Defendants is contractually, strictly, negligently, intentionally, vicariously liable and/or otherwise legally responsible in some manner for the acts and omissions described herein.  Plaintiffs will amend this Complaint to set forth the true names and capacities of each Doe Defendant when the same are ascertained.

36.     Plaintiffs are informed and believe and based thereon allege that Defendants and Doe Defendants 1 through 10, inclusive, and each of them, are and at all material times have been, the agents, servants or employees of each other, purporting to act within the scope of said agency, service or employment in performing the acts and omitting to act as alleged herein.  Each of the Defendants named herein are believed to, and are alleged to, have been acting in concert with, as employee, agent, co-conspirator or member of a joint venture of, each of the other Defendants, and are therefore alleged to be jointly and severally liable for the claims set forth herein, except as otherwise alleged.

## JURISDICTION AND VENUE

37.     This Court has original jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one member of the Class is of diverse citizenship from Defendant, there are more than 100 members in the Class (defined *infra*), and the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs.

38.     This Court has personal jurisdiction over Defendant because Defendant conducts business in the State of California, a substantial portion of the wrongdoing alleged by Plaintiffs occurred in the State of California and this District, and Defendant has sufficient minimum contacts with and/or otherwise has purposefully availed itself of the markets of the State of California and this District such that it is fair and just for Defendant to adjudicate this dispute in this District.

39.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims occurred in this District and, as a corporation subject to personal jurisdiction in this District, Defendant conducts business in this District.

## FACTUAL ALLEGATIONS

40.     Plaintiff Amburgey was diagnosed with severe rheumatoid arthritis in or around 2012 and was prescribed and began using Enbrel in or around January 2015.

41.     Plaintiff Amburgey's insurer, Anthem Blue Cross, requires her to obtain specialty drugs like Enbrel from Caremark's specialty pharmacy. Plaintiff Amburgey obtained Enbrel from Caremark's specialty pharmacy in Redlands, California throughout 2015.

42.     Plaintiff Amburgey sincerely believes that she has received Enbrel from Caremark.  At no relevant time did Plaintiff Amburgey's health insurer change and said insurer required her to obtain Specialty Drugs from Caremark.

43.     Plaintiff Washington was diagnosed with rheumatoid arthritis in or around 1992 and was prescribed and began using Enbrel in or around 2010.

44.     Plaintiff Washington's insurer, United Healthcare, requires her to obtain specialty drugs like Enbrel from Caremark's specialty pharmacy.  Plaintiff Washington obtained Enbrel from Caremark's specialty pharmacy in Monroeville, Pennsylvania from approximately 2014 to the present.

45.     Enbrel is manufactured by Immunex Corporation, a subsidiary of Amgen, in Thousand Oaks, California.  Enbrel is Amgen's best-selling arthritis medicine and Enbrel is one of the top ten drugs in the United States by total sales.[4]

46.     In 2013, sales of Enbrel in the United States exceeded $4.2 billion dollars ($4,256,000,000).[5]  On information and belief, extrapolating based on the population size of California, sales in California accounted for about 12 percent of those sales, e.g. $511 million in California in 2013 alone.

47.     "Enbrel is a prescription medicine that can be self-injected. It is used to treat five long-term inflammatory diseases: moderate to severe rheumatoid arthritis (RA), adult chronic moderate to severe plaque psoriasis in patients who are candidates for systemic therapy or phototherapy, psoriatic arthritis, moderate to severe juvenile idiopathic arthritis (JIA), and ankylosing spondylitis (AS)."[6]

48.     Enbrel is a biotech drug (or biologic), which means it is created inside a living cell culture. "Enbrel is a fusion protein, a molecule produced from recombinant DNA (rDNA)-a kind of molecular graft that combines multiple genetic properties like a horticultural graft joins vascular tissues. In the case of Enbrel, genetically-modified Chinese hamster ovary cells churn out the desired proteins."[7]

---

[4]     *See*   http://www.bloomberg.com/news/2014-04-22/amgen-revenue-misses-analysts-estimates-on-enbrel-sales.html *;* http://www.drugs.com/stats/top100/sales (last visited Feb. 1, 2017).

[5]     Amgen    2013    Letter    to    Shareholders,    accessible    online    at http://investors.amgen.com/phoenix.zhtml?c=61656&p=irol-reportsannual (last visited Feb. 1, 2017).

[6]     *See* http://www.enbrel.com/what-is-ENBREL.jspx (last visited Feb. 1, 2017).

[7]     *See*    http://www.theatlantic.com/technology/archive/2013/06/enbrel-and-the-autoimmune-era/276911/ (last visited Feb. 1, 2017).

1473896_1

49.     Enbrel is offered in four varieties of injection options: (1) Enbrel® SureClick® 50-mg/mL autoinjector; (2) ENBREL single-use prefilled syringe; (3) ENBREL 25-mg multi-use vial free-hand method; and (4) ENBREL 25-mg vial adapter method.[8]

50.     Enbrel, like other specialty drugs, is an expensive drug, with an average monthly cost of $2,436 ($31,668 per year) for one of its varieties.[9]  The out-of-pocket cost for Enbrel can reach $50,000 per year. [10]

51.     According to Express-Scripts, despite their use by only 1-2% of the United States population, specialty drugs accounted for 37% of United States drug spending in 2015.[11]

52.     Plaintiff Amburgey's co-pay for Enbrel was approximately $150.00 per 28-day supply, which is one shipment.

53.     Plaintiff Amburgey's co-pay for Orencia was approximately $150.00 per shipment.

54.     Plaintiff Washington's monthly co-pay for Enbrel is, since January 1, 2017, approximately $1,000.00 per 28-day supply.  Prior to January 1, 2017, Plaintiff Washington's monthly co-pay for Enbrel was approximately $10.00 per 28-day supply. Plaintiff Washington, who is over the age of 65, is a Medicare beneficiary and supplements her healthcare costs through a Medicare Prescription Drug Coverage (Plan D) Plan.  Plaintiff Washington incurred out of pocket costs for Enbrel not covered by any medical insurance.

---

[8]     *See* http://www.enbrel.com/inject-ENBREL.jspx (last visited Feb. 1, 2017).

[9]     *See* https://www.consumerreports.org/health/resources/pdf/best-buy-drugs/BBD_Rheumatoid_Arthritis_Summary.pdf (last visited Feb. 1, 2017).

[10]     *See* Alison Kodjak, Health Inc.: Specialty Drugs Can Prove Expensive Even With Medicare Coverage, NPR, December 3, 2015, *available at* http://www.npr.org/sections/health-shots/2015/12/03/458216778/specialty-drugs-can-prove-expensive-even-with-medicare-coverage.

[11]     *See* https://lab.express-scripts.com/lab/drug-trend-report (last visited Feb. 1, 2017).

THIRD AMENDED COMPLAINT (CLASS ACTION)                                              13

1473896_1

55.     Enbrel must be stored and maintained between a temperature of 36 and 46 degrees Fahrenheit.[12]   The following statement is prominently displayed on the top and on two sides of the Enbrel box:

"**Before and after reconstitution refrigerate at 2° to 8°C (36° to 46°F).**

**DO NOT FREEZE**" (emphasis in original).

56.     The same statement is included on each individual package within the box, and is found in various locations throughout the Medication Guide and Instructions For Use ("Medication Guide") pamphlet included in each box.

57.     Recently, the FDA-approved instructions that allow for Enbrel to be stored at room temperature (68 to 77 degrees Fahrenheit) for up to 14 days.   Once Enbrel reaches room temperature, however, it may not be refrigerated again.

58.     The Medication Guide also instructs that a patient should "[t]hrow away Enbrel that has been stored at room temperature after 14 days."[13]

59.     There are no valid studies supporting the viability of Enbrel shipped outside of the FDA required temperature range of 36 to 46 degrees Fahrenheit.

60.     Rather, the Specialty Drugs (Enbrel and Orencia) become unstable and less effective after exposure to temperatures outside of the 36 to 46 degrees Fahrenheit range.   Among other things, the Specialty Drugs aggregate.   The aggregation causes the Specialty Drugs to become less effective given that the Specialty Drugs are dose-dependent.   For example, if ten (10) percent of the Specialty Drugs' proteins aggregate with one another, its ability to interact with TNF would be proportionally reduced, and the Specialty Drugs' would be approximately ten (10) percent less effective.   This results in painful arthritic flare-ups and irreversible progression of joint damage.

---

[12]     *See* Manufacturer's Medication Guide, *available online at* http://pi.amgen.com/united_states/enbrel/derm/enbrel_mg.pdf (last visited Feb. 1, 2017).

[13]     *See id.*

61.     Several shipments of Enbrel that Plaintiff Amburgey received from Caremark arrived frozen.  Plaintiff Amburgey allowed the Enbrel to thaw and later injected herself with the Enbrel that had frozen.

62.     Caremark provides Enbrel to Plaintiffs and others in standard 28-day doses.

63.     Each shipping box Plaintiff Amburgey received from Caremark contained two boxes of Enbrel.  Each box of Enbrel contains four dose trays of Enbrel. The shipment is intended and required to be used over a 28-day period.

64.     Each shipping box Plaintiff Washington receives from Caremark contains one box of Enbrel.  Each box of Enbrel contains four Enbrel SureClick autoinjectors and is intended and required to be used over a 28-day period.

65.     Immunex only manufactures, sells and distributes Enbrel in 28-day supplies. Thus, even though the FDA allows for storage at room temperature for a maximum of 14 days after delivery, the shipment must not reach room temperature prior to delivery to the patient. Further, as Enbrel cannot be re-refrigerated, a shipment that has reached room temperature prior to delivery must be discarded; otherwise, a patient will unknowingly adulterate the entire shipment simply by following the instructions on the packaging.

66.     Plaintiff Amburgey and her physician eventually determined that the Enbrel was not effectively treating her arthritis symptoms.

67.     The adulterated Specialty Drugs dispensed by Caremark to Plaintiffs and the Class were less effective than unadulterated versions of the same Specialty Drugs. After injecting the Specialty Drugs, both Plaintiffs experienced painful arthritic flare-ups which resulted in, among other things, painful joint inflammation and swelling.

68.     At her physician's advice, Plaintiff Amburgey eventually discontinued use of Enbrel in or around December 2015 to try other medications.

69.     In 2016, Plaintiff Amburgey tried Celgene and later Orencia, without results.  Caremark dispensed both medications to Plaintiff Amburgey.

70.    "ORENCIA® (abatacept) is a prescription medicine that reduces signs and symptoms in adults with moderate to severe RA [(Adult Rheumatoid Arthritis)], including those who have not been helped enough by other medicines for RA. ORENCIA may prevent further damage to your bones and joints and may help your ability to perform daily activities. In adults, ORENCIA may be used alone or with other RA treatments other than tumor necrosis factor (TNF) antagonists."[14]

71.    Orencia was approved by the FDA in 2005 and has been approved for a patent extension which is currently set to expire in the U.S. in 2019. Orencia is manufactured by Bristol-Myers Squibb.

72.    Upon knowledge and belief, Orencia and Enbrel share substantially the same or identical storage requirements and packaging warnings.

73.    Sales of Orencia in the United States exceeded $423 million in 2016 and $372 million in 2015.

74.    Because Orencia must be administered using an IV injection, Orencia is shipped directly to a patient's healthcare provider for injection.

75.    Plaintiff Amburgey later learned that she had an infection that was affecting her artificial knee replacement.

76.    Physicians informed Plaintiff Amburgey that she had likely had the infection for some time—including during time she was taking Enbrel—without knowing it.

77.    Serious infections are a well-known side effect of Enbrel. According to the manufacturer, "Infections, including serious infections, some fatal, have been observed in patients treated with ENBREL. Discontinue ENBREL if a patient develops a serious infection or sepsis." (https://www.enbrel.com/hcp/why-enbrel/safety-in-rheumatology/)

---

[14] https://www.orencia.bmscustomerconnect.com/

THIRD AMENDED COMPLAINT (CLASS ACTION)                    16

78.   Upon information and belief, Plaintiff Amburgey's infection was caused and/or exacerbated by the adulterated Enbrel and Orencia, resulting in pain and suffering, other economic damages, and two surgeries on her knee.

79.   Based on the advice of her physicians, Plaintiff Amburgey discontinued all medications and arranged to have two surgeries to replace her knee.

80.   In or around June 2016, Plaintiff Amburgey had surgery to add a spacer in her knee.  In or around August 2016, Plaintiff Amburgey had surgery to replace her knee.

81.   Plaintiff Amburgey's physicians told her that she can and should resume use of Enbrel after one-year passes from her last surgery.

82.   Plaintiff Amburgey plans to resume using Enbrel in the future to attempt to alleviate her severe arthritis symptoms.

83.   A real estate agent by trade, Plaintiff Amburgey has recently been unable to work due to the pain associated with walking and moving around and plans to resume working if she is able to reduce the painful symptoms associated with her arthritis.

84.   As explained below, since at least May 2014, Caremark's cold chain has caused all shipments of Specialty Drugs that took more than 20 hours to deliver to experience improper temperature excursions. Specifically, during the course of a single shipment the Specialty Drug would either freeze from the use of too-cold gel packs, or rise to temperatures far warmer than the FDA-specified limit as a result of the packaging's insufficient insulation, or both.

85.   As explained below, some or all shipments of Enbrel shipped to Plaintiff Amburgey arrived frozen and/or too warm, or experienced temperature excursions during transit.  The Enbrel dispensed and shipped by Caremark was injected into Plaintiff Amburgey's body.

86.   As explained below, some or all shipments of Orencia shipped to Plaintiff Amburgey's healthcare provider arrived frozen and/or too warm, or experienced

1473896_1

temperature excursions during transit. The Orencia dispensed and shipped by Caremark was injected into Plaintiff Amburgey's body.

87.     As explained below, some or all shipments of Enbrel shipped to Plaintiff Washington arrived frozen and/or too warm, or experienced temperature excursions during transit. The Enbrel dispensed and shipped by Caremark was injected into Plaintiff Washington's body.

88.     These injections of adulterated Specialty Drugs caused Plaintiffs Amburgey and Washington pain and suffering.

89.     The adulterated Specialty Drugs pose serious side effects, including cancer and death, that no reasonable consumer would subject themselves to if they knew that the Specialty Drugs provided by Caremark were not stored, handled, or shipped appropriately.

## Caremark's Common Course of Conduct

90.     Caremark employs common written procedures and protocols (the "Protocols") at each of its specialty pharmacies across the United States, including its specialty pharmacies in Redlands, California and Monroeville, Pennsylvania.

91.     Caremark handles ships all of the Specialty Drugs to Plaintiffs and the Class according to the Protocols, which include a uniform set of policies and procedures.

92.     Caremark's Protocols for the preparation, dispensing, and/or shipment of Enbrel and other Specialty Drugs are inadequate, as they do not ensure that Specialty Drugs have remain within the specified temperature range of 36 – 46° F.

93.     Upon information and belief, the Caremark employees and executives responsible for designing, developing, drafting, maintaining, and evaluating its pharmaceutical cold chain were unqualified for such tasks.

94.     Upon information and belief, the Caremark employee responsible for drafting its cold chain protocol, Walid Saad, has no relevant experience whatsoever with cold chains of any kind.

95.    These Protocols contain common defects that result in Specialty Drugs not being maintained at the required temperature range.

96.    Common sense dictates that leaving Specialty Drugs – the containers for some of which are as small as a tube of lip balm – exposed to a pharmacy's room temperature will cause the medication to rise more than 5° F.   For example, a standard-sized ice cube will melt in an empty glass in less than an hour.

97.    Caremark's Protocols require Specialty Drugs to be placed into shipping boxes with Styrofoam containers that fail to prevent the boxes' contents from equilibrating to ambient temperatures.

98.    Caremark's Protocols require Specialty Drugs to be placed into shipping boxes with that do not have enough gel pack mass to adequately maintain the Specialty Drugs at the required temperature range.

99.    Increasing or decreasing gel pack temperatures will not cure Caremark's Protocols – improved packaging and increased gel pack mass are required

100.   Increasing the mass of the gel packs would increase the weight of the shipment and therefore increase the cost of shipping the Specialty Drugs.

101.   By definition, the 36° - 46° F FDA-mandated temperature range is only ten degrees wide, meaning that a Specialty Drug refrigerated at 41° F may only deviate 5°F in either direction.

102.   Keeping the contents of a shipping package within 5° F of a specified temperature is very difficult and generally requires active cooling systems.

103.   Keeping something frozen, such as mail-order steaks, is much less difficult because the product can be initially frozen much colder than 32° F, with the expectation that it will get warmer during shipping, but still remain frozen.

104.   Shipping company Federal Express ("FedEx") offers a real-world, off-the-shelf active cooling system in a Styrofoam container with a small chiller that regulates the temperature of pharmaceutical shipments.   The size necessary to ship a box of

Enbrel costs approximately $133.00 per unit.  FedEx describes the shipping containers as follows:

> Cold shipping without any hassles
>
> If you need a reliable, cost-effective way to transport your temperature-sensitive shipments to and from your customers around the globe, the cold shipping package provided by FedEx maintains a constant 2–8°C (35.6–46.4°F) environment for your products — without the hassle of gel packs. This lightweight, one-time use package comes in a variety of sizes. Just choose the one that best fits your needs. Click here to learn more and see a demo. If you need to replace your expired cooling engine on your cold shipping package, choose from the variety of sizes.[15]
>
> It includes a chilling unit activated by the shipper and placed in the box with the shipment. The unit continuously evaporates small amounts of water at low pressure, keeping your shipment at 2°C to 8°C for up to 48 or 96 hours*, depending on the packaging option you choose.[16]

105.   Caremark only uses passive systems – frozen gel packs – which are far less expensive.

106.   Upon information and belief, Caremark's cardboard boxes and Styrofoam coolers can be purchased from an office supply store for as little as a couple dollars.

107.   Upon information and belief, Caremark has exposed and continuous to expose an untold number of Americans to adulterated Specialty Drugs that have serious and fatal side effects, and the efficacy of which is in question because it is illegal and immoral to test adulterated drugs on human beings.  *See, e.g., United States v. Stanley*, 483 U.S. 669, 709–10, 107 S. Ct. 3054, 3066, 97 L. Ed. 2d 550 (1987) (O'Connor, J., concurring in part and dissenting in part) ("No judicially crafted rule should insulate from liability the involuntary and unknowing human experimentation alleged  to have occurred in this case.").

108.   "Verification and validation are independent procedures that are used together for checking that a product, service, or system meets requirements and

---

[15] http://www.orderboxesnow.com/

[16] http://www.fedex.com/us/temp-assure/cold-shipping-package.html

specifications and that it fulfills its intended purpose. These are critical components of a quality management system such as ISO 9000."[17]

109.   "It is sometimes said that validation can be expressed by the query 'Are you building the right thing?' and verification by 'Are you building it right?'. 'Building the right thing' refers back to the user's needs, while 'building it right' checks that the specifications are correctly implemented by the system. In some contexts, it is required to have written requirements for both as well as formal procedures or protocols for determining compliance."[18]

110.   "It is entirely possible that a product passes when verified but fails when validated. This can happen when, say, a product is built as per the specifications but the specifications themselves fail to address the user's needs."[19]

111.   Upon information and belief, Caremark never included temperature monitors or sent test shipments of Specialty Drugs to validate that its cold chain policies and procedures actually work.

112.   Caremark uniformly utilizes frozen and room temperature gel packs when shipping all Specialty Drugs to consumers.

113.   Per a new policy started in or around May 2014, Caremark has placed a room temperature gel pack between the Specialty Drug boxes and the frozen gel packs.

114.   Room temperature gel packs are not good insulators as they conduct thermal energy.

115.   Thermal equilibrium causes the gel packs to equilibrate with each other in temperature.  Eventually all of the contents of a shipment, including the Specialty Drugs and gel packs, equilibrate in temperature. For example, a room temperature gel pack can freeze if placed next to a frozen gel pack stored at a low enough temperature.

---

[17] https://en.wikipedia.org/wiki/Verification_and_validation
[18] *Id.*
[19] *Id.*

116.   Placement of a room temperature gel pack does not guarantee or effectively ensure the temperature of the Enbrel and other Specialty Drugs.

117.   The outer packaging (e.g., the cardboard box) used to ship the Specialty Drugs contains affirmative misrepresentations, including:

    a.   The statement: "The melting of the cold pack can be expected during transit of your order" which represents that the Specialty Drug was shipped appropriately;

    b.   A logo of a penguin crossed out, which represents that the Specialty Drug has not been frozen and should not be frozen, as well as an instruction to keep the Specialty Drug refrigerated;

118.   Caremark includes a pre-printed notice in each Specialty Drug shipment that represents that its shipping procedure and/or process is "new and improved," "does even more" to keep Specialty Drugs cold, and exceeds "industry standards".  All of these affirmative misrepresentations are false.

119.   Caremark's shipment of the Specialty Drugs fails to comply with all known industry standards, including those promulgated by the United States Pharmacopeia, International Standards Organization, International Safe Transit Association, and ASTM International.

120.   Caremark adds a "REFRIGERATED" label to each Specialty Drug package which serves to misrepresent that the Specialty Drug has been adequately refrigerated and that Plaintiffs and class members should place the Specialty Drug in a refrigerator despite the known temperature deviations.

121.   Caremark ships Specialty Drugs to Plaintiffs and other class members using United Parcel Services ("UPS").  On the rare occasion when a shipment is rejected because the customer is not home, the Specialty Drug is delivered via a number of express couriers, including, but not limited to, Golden State Same Day Couriers.  On information and belief, UPS and the express couriers that Caremark uses

do not utilize temperature-controlled vehicles for transport of Specialty Drugs to Plaintiff and other consumers.

122.   Upon information and belief, Caremark could deliver Specialty Drugs to consumers on the same day at a higher cost.

123.   Upon information and belief, Caremark chooses not to increase the gel pack mass in Specialty Drug shipments because doing so would increase shipping weight and therefore the cost to ship the Specialty Drug.

124.   Upon information and belief, Caremark's shipping container, which consists of a Styrofoam cooler and an outer corrugated cardboard box, in combination with the mass of gel packs used, is incapable of preventing less than five degrees (5°) of temperature variation for more than 20 hours.

125.   The Styrofoam coolers used by Caremark are not effective in keeping outside ambient temperatures from affecting the interior contents of a Specialty Drug shipment.

126.   Among other deficiencies, Caremark does not include a sufficient mass of gel packs in each shipment to maintain the FDA-required temperature range during shipment of Specialty Drugs for the duration of the shipment.  This results in many Specialty Drugs reaching room temperature before they are placed in the Caremark shipping container where the Specialty Drug is re-refrigerated or frozen from the thermal effects the gel packs.

127.   For example, thermal equilibrium dictates that in order for a Specialty Drug to arrive at or below the upper limit of 46° F with the mass of gel packs used by Caremark, the gel packs initially placed in the shipping container would have to be so cold that they would first freeze the contents of the shipment, the Specialty Drug.

128.   Specialty Drugs such as Enbrel cannot be re-refrigerated once they reach room temperature.  The entire shipment would therefore be adulterated as a matter of law and may not be lawfully dispensed or sold.

129.   Upon information and belief, any Specialty Drug placed in Caremark's shipping container for more than 20 hours gets too warm, with many exceeding 68°F (e.g., room temperature) after less than 20 hours.

130.   For example, if a Specialty Drug is packed early in a shift at 7 a.m., the Specialty Drug will have been in the Caremark shipping container for 24 hours at 7 a.m. the next day before it is delivered.   If the Specialty Drug is not delivered until 7 p.m. the day after it was shipped, it may have been the Caremark shipping container for 36 hours.

131.   Even if a Specialty Drug is packed late in a shift at 7 p.m., the Specialty Drug will have been in the Caremark shipping container for 12 hours at 7 a.m. the next day.  If the Specialty Drug is not delivered until 7 p.m. the day after it was shipped, it may have been the Caremark shipping container for 24 hours.

132.   Thus, nearly 100% the Specialty Drugs shipped by Caremark via UPS overnight are in transit for a minimum of 12 hours.

133.   Upon information and belief, because Caremark ships using United Parcel Service ("UPS") overnight delivery, the majority of Specialty Drugs shipped by Caremark are in transit for more than 20 hours.

134.   Caremark has never instructed Plaintiffs or the Class, in writing or otherwise, to verify the temperature of the Specialty Drugs filled by its specialty pharmacies.

135.   Caremark has never provided or included a means by which Plaintiffs or the Class could monitor or verify the temperature of the Specialty Drugs after they left Caremark's pharmacies.

136.   For example, Caremark could affix a disposable temperature indicator on Specialty Drug boxes or include a reusable temperature recorder, but does not.

137.   Disposable temperature indicators could be purchased from vendors such as 3M for a nominal cost.

138.   Caremark could ship Plaintiffs' Enbrel and other class members' Specialty Drugs to them through a courier that utilizes climate controlled delivery vehicles (such as those that distribute meat and grocery products).

139.   On information and belief, because the vehicles used to transport the Enbrel and other Specialty Drugs are not temperature controlled, the temperature of the Enbrel and other Specialty Drugs was much less than 32 degrees Fahrenheit at the time it left the shipping facility and remained at this below freezing temperature during transit, as it would have warmed during transit and upon removal from the packaging.

140.   The concealed fact that the Enbrel and the other Specialty Drugs delivered to Plaintiffs and class members may have frozen is a material fact because Plaintiffs, as reasonable consumers, would have acted differently had they been informed of the concealed fact, including, but not limited to: (1) purchasing a competing product instead of the Specialty Drugs; (2) selecting the Specialty Drugs from a different source; and/or (3) paying less for the Specialty Drugs.  As such, Defendant has a duty to disclose said material information to Plaintiffs and other members of the Class.

141.   The concealed fact that the Specialty Drugs delivered to Plaintiffs and class members may have been stored and/or shipped outside of the specified temperature range is a material fact because Plaintiffs, reasonable consumers, would have acted differently had they been informed of the concealed fact,, including, but not limited to: (1) purchasing a competing product instead of a Specialty Drug; (2) selecting the Specialty Drug from a different source; and/or (3) paying less for the Specialty Drug.  As such, Defendant has a duty to disclose said material information to Plaintiffs and other members of the Class.

142.   The concealed fact that Defendant does not have adequate policies and procedures to store and distribute Specialty Drugs in the specified temperature range is a material fact because Plaintiffs, reasonable consumers, would have acted differently had they been informed of the concealed fact, including, but not limited to: (1) purchasing a competing product instead of a Specialty Drug; (2) selecting a Specialty

Drug from a different source; and/or (3) paying less for the Specialty Drug.  As such, Defendant has a duty to disclose said material information to Plaintiffs and other members of the Class.

143.   Had Plaintiffs and other members of the Class been aware of any of the omitted information, they would not have purchased the Specialty Drugs or would have paid less money for the Specialty Drugs.  As such, Defendant caused Plaintiffs and other class members to suffer an economic injury and loss.

144.   Like the Specialty Drugs, the smallpox vaccine must be kept between 36 and 46 degrees Fahrenheit and cannot be frozen.  The Centers for Disease Control ("CDC") publishes a Guide for Smallpox Vaccine Packing and Shipping ("Guide"). The guidelines are based in part on CDC's research on different shipping and handling methods under strenuous test conditions.

145.   The CDC also urges pharmacies to "consider including at least one heat indicator and one cold indicator in every box, with instructions on how to interpret them."  Guide, at 9.  Later, it notes that "temperature monitors should normally be used." Guide, at 11.

146.   The CDC also notes that it is important to establish a routine, systematic process. On information and belief, any policies and procedures Defendant purports to have with regard to packing and shipment of Specialty Drugs are inadequate and are not routine or systematic.

147.   Plaintiff Amburgey received shipments of Specialty Drugs that were frozen upon arrival.

148.   Unbeknownst to her at the time, Plaintiff Washington received shipments of Specialty Drugs that were room temperature upon arrival.

149.   Plaintiff Washington followed Caremark's instructions to place the Specialty Drugs in her refrigerator.

150.   Upon information and belief, the Specialty Drugs shipped to Plaintiffs Amburgey and Washington were subject to all of the uniform defects described above and therefore were not maintained at the FDA-mandated temperature range.

151.   Both Plaintiffs Amburgey and Washington noticed a lack of efficacy in treating the symptoms of their arthritis when using Specialty Drugs shipped by Caremark's specialty pharmacies.

## CLASS ALLEGATIONS

152.   Plaintiffs bring this action on behalf of themselves and as a class action pursuant to the provisions of Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure.  Plaintiff Amburgey seeks to represent a class initially defined as:

> Any resident of California who obtained a Specialty Drug from any Caremark specialty pharmacy during the Class Period (hereinafter, the "California Class").

153.   Plaintiff Washington seeks to represent a class initially defined as:

> Any resident of Wisconsin who obtained a Specialty Drug from any Caremark specialty pharmacy during the Class Period (hereinafter, the "Wisconsin Class").

Unless otherwise specified, as used throughout this Complaint, the term "Class" includes the California Class and Wisconsin Class, defined above.

154.   The "Class Period" for the Class dates back four years (or the length of the longest applicable statute of limitations for any claim asserted) and continues through the present and the date of judgment.  Specifically excluded from the Class are: (a) any officers, directors, or employees of Defendant; (b) any judge assigned to hear this case (or spouse or immediate family member of any assigned judge); (c) any employee of the Court; (d) any juror selected to hear this case; and (e) any attorneys of record and their employees.

155.   Plaintiffs reserve the right to modify, expand, or amend the above class definitions or seek certification of a class or subclasses that are defined differently than

above before any court determines whether certification is appropriate following discovery.

156. *Numerosity.* Members of the Class are so numerous that joinder of all members is impracticable. While the number of Class members is unknown to Plaintiffs at this time, Plaintiffs are informed and believe that the Class numbers at least in the thousands.

157. *Ascertainability.* The community of interest among the class members in the litigation is well defined and the proposed Class is ascertainable from objective criteria. The identities of class members can be obtained from Defendant's business records. Class members can be notified of the pendency of Plaintiffs' Complaint by mail or published notice. If necessary to preserve the case as a class action, the Court can redefine the Class and/or create subclasses.

158. *Commonality and Predominance.* There is a well-defined community of interest in the questions of law and fact affecting the parties to be represented in this action. Common questions of law and fact that exist as to all members of the Class and predominate over any questions affecting only individual members, include, but are not limited to:

     a. Whether Caremark determined proper storage, handling and shipping practices for Specialty Drugs;

     b. Whether Caremark failed to store and ship Specialty Drugs in the specified temperature range during transit between Caremark's specialty pharmacies and the delivery address supplied by consumers;

     c. Whether Caremark's instructions to "Refrigerate Upon Receipt or Refrigerate Upon Opening" are false and misleading to consumers who may incorrectly assume that the temperature of the Specialty Drugs at the time of delivery is not relevant;

     d. Whether Caremark's failure to disclose that it does not have adequate policies and procedures to ensure that the Specialty Drugs are maintained

within the specified temperature range constitutes a material omission likely to deceive a reasonable consumer;

e.  Whether Caremark's failure to disclose that Specialty Drugs it ships may freeze during transit and no longer be suitable for use constitutes a material omission likely to deceive a reasonable consumer;

f.  Whether Caremark's failure to disclose that Specialty Drugs it ships may exceed the upper temperature limit and therefore (a) cannot be again refrigerated upon receipt and (b) are only suitable for use for a maximum of fourteen (14) days constitutes a material omission likely to deceive a reasonable consumer;

g.  Whether Caremark's failure to disclose that Specialty Drugs it ships should be discarded for failing to meet FDA guidelines constitutes a material omission likely to deceive a reasonable consumer;

h.  Whether Caremark violated Cal. Civ. Code § 1750 *et seq.* by making material omissions likely to deceive consumers, thereby making misrepresentations and untrue representations under Cal. Civ. Code § 1770(a);

i.  Whether Caremark violated Cal. Bus. & Prof. Code § 17200 *et seq.*;

j.  Whether Caremark violated the California Health & Safety Code;

k.  Whether Caremark violated Wis. Stat. § 100.18;

l.  Whether Caremark violated Wis. Stat. § 402.314; and

m.  Whether Plaintiffs and class members sustained injury and damages resulting from Caremark's conduct and, if so, the proper measure of statutory damages, declaratory and equitable relief, and the amount and nature of such relief.

159.  *Typicality*.   Each Plaintiff's claims are typical of the claims of other members of the Class.  Typical of other class members, each Plaintiff's Specialty Drug prescription was filled, provided and shipped by Caremark.  Plaintiffs and the class

members each sustained damages arising from Caremark's common course of wrongful conduct, as alleged more fully herein. Plaintiffs' claims are founded on the same legal theories as those of the Class. The effort each Plaintiff undertakes to pursue her own claim will significantly benefit the class members because of the identical nature of the issues across the Class.

160. *Adequacy of Representation*. Each Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the other class members and because both Plaintiffs have retained counsel competent and experienced in complex class action and consumer litigation, including substantial experience in the types of claims alleged in this Complaint. Plaintiffs and their counsel will fairly and adequately protect the interests of the Class.

161. *Declaratory and Injunctive Relief*. Caremark has acted or refused to act on grounds generally applicable to Plaintiffs and other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Class.

162. *Superiority of Class Adjudication*. The certification of a class in this action is superior to the litigation of a multitude of cases by members of the Class. Class adjudication will conserve judicial resources and will avoid the possibility of inconsistent rulings. Moreover, there are class members who are unlikely to join or bring an action due to, among other reasons, their reluctance to sue Defendant and/or their inability to afford a separate action. Equity dictates that all persons who stand to benefit from the relief sought herein should be subject to the lawsuit and hence subject to an order spreading the costs of the litigation among the class members in relation to the benefits received. The damages, restitution, and other potential recovery for each individual member of the Class are modest, relative to the substantial burden and expense of individual prosecution of these claims. Given the amount of the individual class members' claims, few, if any, class members could afford to seek legal redress individually for the wrongs complained of herein. Individualized litigation presents a

potential for inconsistent or contradictory judgments.   Individualized litigation increases the delay and expense to all parties and the court system presented by the complex legal and factual issues of the case.   By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

163.   In the alternative, the above-referenced Class may be certified because:

    a.    The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual class members' claims which would establish incompatible standards of conduct for Defendant;

    b.    The prosecution of separate actions by individual members of the Class would create a risk of adjudications which would as a practical matter be dispositive of the interests of other members of the class who are not parties to the adjudications, or which would substantially impair or impede the ability of other class members to protect their interests; and,

    c.    Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class.

## COUNT I

**Violation of the California Consumers Legal Remedies Act,**

**Cal. Civ. Code § 1750 *et seq.***

**(By Plaintiff Amburgey on Behalf of the California Class)**

164.   Plaintiff Amburgey incorporates all preceding and succeeding allegations by reference as if fully set forth herein.

165.   Plaintiff Amburgey brings this claim in dividually and on behalf of the CA Pharmacy Class against Defendant.

166.   In addition, Plaintiff Amburgey brings her request for injunctive relief on behalf of the general public.

167.   This cause of action is brought pursuant to the California Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.* (the "CLRA").

168.   Defendant's actions, representations and conduct have and continue to be subject to the CLRA because they extend to transactions that are intended to result, or that have resulted, in the sale of goods to consumers.

169.   Plaintiff Amburgey and other members of the California Class are "consumers" within the meaning of Cal. Civ. Code § 1761(d).

170.   Defendant is a "person" as defined by Cal. Civ. Code § 1761(c).

171.   Each of the Specialty Drugs is a "good" within the meaning of Cal. Civ. Code § 1761(a).

172.   Plaintiff Amburgey and many other members of the California Class are either "disabled persons" within the meaning of Cal. Civ. Code § 1761(g) or are "senior citizens" within the meaning of Cal. Civ. Code § 1761(f).

173.   Defendant's conduct is unlawful in that it violates the California Health & Safety Code. *See, inter alia*, Cal. Health & Safety Code §§ 111255; 111260; 111280; 111285; 111290.

174.   By engaging in the deceptive acts and practices set forth in this Complaint, Defendant violated, and continues to violate the CLRA in at least the following respects:

    a.   In violation of § 1770(a)(2), Defendant misrepresented the source, sponsorship, approval, or certification of the Specialty Drugs, as delivered by Defendant.

    b.   In violation of § 1770 (a)(5), Defendant represented that the Specialty Drugs, as delivered by Defendant, have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have.

c. In violation of § 1770 (a)(6), Defendant represented that the Specialty Drugs, as delivered by Defendant, are original or new though they have deteriorated unreasonably or are altered, reconditioned, reclaimed, used, or secondhand.

d. In violation of § 1770 (a)(7), Defendant represented that the Specialty Drugs, as delivered by Defendant, are of a particular style or model, though they are of another.

e. In violation of § 1770 (a)(16), Defendant represented that the Specialty Drugs, as delivered by Defendant, have been supplied in accordance with previous representations when they have not.

175. Had Caremark disclosed that the Specialty Drugs filled by mail order and delivered to Plaintiff Amburgey and members of the California Class may not have been maintained at the specified temperature range of 36 and 46 degrees Fahrenheit during storage and delivery, Plaintiff Amburgey and members of the California Class would have refused the delivery of the Specialty Drugs and/or would have paid less for the Specialty Drugs.

176. Had Caremark included upper-limit and lower-limit (or a combination of the two) temperature indicators in the Specialty Drugs shipments it filled by mail order and delivered to Plaintiff Amburgey and members of the California Class, Plaintiff Amburgey and members of the California Class would not have purchased the Specialty Drugs, would have refused the delivery of the Specialty Drugs and/or would have paid less for the Specialty Drugs that were delivered outside of the specified temperature range.

177. Had Caremark included a temperature recorder with the Specialty Drugs filled by mail order and delivered to Plaintiff Amburgey and members of the California Class, Plaintiff Amburgey and members of the California Class would not have purchased the Specialty Drugs, would have refused the delivery of the Specialty Drugs

and/or would have paid less for the Specialty Drugs that were delivered outside of the specified temperature range.

178.   Had Plaintiff Amburgey and members of the California Class known that the Specialty Drugs provided by Caremark's specialty pharmacies may have frozen during storage or shipment, they would have not have purchased the Specialty Drugs, would have refused the delivery of the Specialty Drugs and/or would have paid less for the Specialty Drugs.

179.   Had Plaintiff Amburgey and members of the California Class known that the Specialty Drugs provided by Caremark's specialty pharmacies may have exceeded the upper limit of the specified temperature range of 36 and 46 degrees Fahrenheit during storage or shipment, they would not have purchased the Specialty Drugs, would have refused the delivery of the Specialty Drugs and/or would have paid less for the Specialty Drugs.

180.   Had Plaintiff Amburgey and members of the California Class known that the Specialty Drugs provided by Caremark's specialty pharmacies may exceed the upper limit of the specified temperature range of 36 and 46 degrees Fahrenheit during storage or shipment, they would have not have purchased the Specialty Drugs, would have refused the delivery of the Specialty Drugs and/or would have paid less for the Specialty Drugs.

181.   Had Caremark disclosed to Plaintiff Amburgey and members of the California Class that it did not possess, utilize, or apply adequate policies and procedures to maintain specified temperature range of 36 and 46 degrees Fahrenheit during storage or mail order shipment, they would have not have purchased the Specialty Drugs, would have refused the delivery of the Specialty Drugs and/or would have paid less for the Specialty Drugs.

182.   Plaintiff Amburgey and members of the California Class deem the disclosure of above-described information important in determining how to act in the transactions at issue.

183.   At all times Defendant had a duty to disclose the above-described information to Plaintiff Amburgey and members of the California Class.   Failure to provide such information could result in significant health and safety risks to Plaintiff Amburgey and the California Class, resulting in them injecting and/or using Specialty Drugs that are adulterated, misbranded, mutated, ineffective, or, at the very least, not approved for use due to health and safety concerns.   The Immunex-authored Enbrel Medication Guide (that "summarizes the most important information about Enbrel") warns:[20]

    a.    "Store Enbrel in the refrigerator at 36° to 46°F (2° to 8°C)";

    b.    "Once Enbrel has reached room temperature, do not put it back in the refrigerator";

    c.    "Throw away Enbrel that has been stored at room temperature after 14 days";

    d.    "Do not store Enbrel in extreme heat or cold. For example, avoid storing Enbrel in your vehicle's glove box or trunk"; and

    e.    "Do not freeze".

184.   Moreover, Defendant had exclusive actual knowledge and actively concealed and suppressed the above-described information that it was duty-bound to disclose.   Plaintiff Amburgey and members of the California Class have no independent means of obtaining said information.

185.   Defendant's acts and omissions constitute unfair, deceptive, and misleading business practices in violation of Cal. Civ. Code § 1770(a).

186.   Plaintiff Amburgey has suffered actual damages and injury, including but not limited to, pecuniary damages, as a result of Defendant's unfair, deceptive, and misleading business practices.

---

[20] http://pi.amgen.com/united_states/enbrel/derm/enbrel_mg.pdf.

187.   Plaintiff Amburgey has complied with Cal. Civ. Code § 1782(a) by notifying Defendant in writing, by certified mail with return receipt requested (letter mailed Feb. 1, 2017 and received by Defendant on Feb. 6, 2017), of the violations alleged herein, and demanded that Defendant remedy and take corrective action.  As of the filing of this Complaint, the time for Defendant to respond has elapsed and, as Defendant has not responded or otherwise taken corrective action, Plaintiff Amburgey seeks recovery of actual and statutory damages through this Complaint.

188.   Based on the foregoing Plaintiff Amburgey, on behalf of herself and the California Class, seeks appropriate relief including:  (a) damages; (b) restitution; (c) injunctive relief in the form of an order requiring Defendant to cease the acts of unfair competition alleged herein and to correct and/or enact adequate policies and procedures for filling, providing and shipment of the Specialty Drugs; (d) injunctive relief in the form of an order requiring Defendant to include a temperature indicator on the Specialty Drug boxes and/or include a reusable temperature recorder, as well as appropriate warnings in conspicuous form about the shipping protocol deficiencies described within and associated risks and instructions; and (e) the payment of reasonable attorneys' fees and costs pursuant to Cal. Civ. Code § 1780(e) and/or other law.

189.   In addition, Plaintiff Amburgey and members of the California Class who are senior citizens (65 years of age or older) and/or disabled are further entitled to statutory damages of up to five thousand ($5,000) pursuant to Cal. Civ. Code § 1780(b) because they have suffered substantial physical, emotional, or economic damage resulting from Defendant Caremark's conduct and (1) Defendant knew or should have known that their conduct was directed to one or more persons who was a senior citizen and/or disabled; and/or (2) Defendant's conduct caused one or more senior citizen and/or disabled person to suffer: loss or encumbrance of a primary residence or source of income, or to suffer substantial loss of property set aside for retirement, or for personal or family care and maintenance, or substantial loss of assets essential to the

health or welfare of the senior citizen and/or disabled person; and/or (3) Plaintiff and the California Class consist of one or more senior citizens and/or disabled persons who are substantially more vulnerable than other members of the public to Defendant's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and actually suffered substantial economic damage resulting from Defendant's conduct. *See* Cal. Civ. Code § 3345(b)(1)-(3).

## COUNT II

### Violation of Unfair Competition Law,

### Cal. Bus. & Prof. Code § 17200 *et seq.* – "Unlawful" Prong

### (By Plaintiff Amburgey on Behalf of the California Class)

190.   Plaintiff Amburgey incorporates all preceding and succeeding allegations by reference as if fully set forth herein.

191.   Plaintiff Amburgey brings this claim individually and on behalf of the California Class against Defendant.

192.   This cause of action is brought pursuant to California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* ("the UCL").

193.   Defendant engaged in unlawful, unfair, and/or fraudulent conduct under the UCL by concealing the material fact that it does not have adequate policies and procedures for filling, providing and shipment of Specialty Drugs to Plaintiff Amburgey and members of the California Class.  Defendant knew or should have known that its omissions and affirmative misrepresentations were likely to deceive consumers.

194.   Defendant's conduct is unlawful in that it violates the CLRA.

195.   Defendant's actions and practices constitute "unlawful" business practices in violation of the UCL because, among other things, they violate the CLRA as detailed in Plaintiff Amburgey's first cause of action.

196. Defendant's conduct is also unlawful in that it violates the California Health & Safety Code. *See, inter alia*, Cal. Health & Safety Code §§ 111255; 111260; 111280; 111285; 111290.

197. Had Plaintiff Amburgey and members of the California Class known that Defendant did not have adequate policies and procedures for packaging and shipment of the Specialty Drugs, they would not have purchased the Specialty Drugs from Defendant, and/or would have paid less for the Specialty Drugs.

198. As a direct and proximate result of Defendant's violations, Plaintiff Amburgey and members of the California Class have suffered and continue to suffer injury in fact and lose money or property as a result of Defendant's material omissions and affirmative misrepresentations.

199. Plaintiff Amburgey, on behalf of herself and the California Class, seeks: (a) injunctive relief in the form of an order requiring Defendant to cease the acts of unfair competition alleged herein and to correct and/or enact adequate policies and procedures for filling, dispensing and shipping of Specialty Drugs; (b) injunctive relief in the form of an order requiring Defendant to include a temperature indicator on Specialty Drug boxes and/or include a reusable temperature recorder, as well as appropriate warnings in conspicuous form about the shipping protocol deficiencies described within and associated risks and instructions;; (c) restitution; (d) declaratory relief; and (e) attorney fees and costs pursuant to Cal. Code Civ. P. § 1021.5, *inter alia*.

## COUNT III

### Violation of Unfair Competition Law,

### Cal. Bus. & Prof. Code § 17200 *et seq.* – "Fraudulent" Prong

### (By Plaintiff Amburgey on Behalf of the California Class)

200. Plaintiff Amburgey incorporates all preceding and succeeding allegations by reference as if fully set forth herein.

201. Plaintiff Amburgey brings this claim individually and on behalf of the California Class against Defendant.

202.   This cause of action is brought pursuant to California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* ("the UCL").

203.   Defendant engaged in unlawful, unfair, and/or fraudulent conduct under the UCL by concealing the material fact that it does not have adequate policies and procedures for filling, providing and shipment of Specialty Drugs to Plaintiff Amburgey and members of the California Class.   Defendant knew or should have known that its omissions and affirmative misrepresentations were likely to deceive consumers.

204.   A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

205.   Defendant's business acts or practices of failing to disclose and actively concealing material information, as described herein, are fraudulent within the meaning of the UCL because they were likely to deceive and did deceive Plaintiff Amburgey and other members of the consuming public into believing that it had adequate policies and procedures to ensure that the Specialty Drugs were maintained, stored, dispensed and shipped at the specified temperature range and that the Specialty Drugs were not adulterated, misbranded, mutated, ineffective, or otherwise unapproved for use due to health and safety concerns, when in fact Caremark did not possess, utilize, or apply adequate policies and procedures to maintain specified temperature ranges of the Specialty Drugs during storage or mail order shipment.

206.   Had Caremark disclosed that the Specialty Drugs filled by mail order and delivered to Plaintiff Amburgey and members of the California Class may not have been maintained at the specified temperature range of 36 and 46 degrees Fahrenheit during storage and delivery, Plaintiff Amburgey and members of the California Class would have refused the delivery of the Specialty Drugs and/or would have paid less for the Specialty Drugs.

207.   Had Caremark included upper-limit and lower-limit (or a combination of the two) temperature indicators in the Specialty Drugs shipments it filled by mail order

and delivered to Plaintiff Amburgey and members of the California Class, Plaintiff Amburgey and members of the California Class would not have purchased the Specialty Drugs, would have refused the delivery of the Specialty Drugs and/or would have paid less for the Specialty Drugs that were delivered outside of the specified temperature range.

208.   Had Caremark included a temperature recorder with the Specialty Drugs filled by mail order and delivered to Plaintiff Amburgey and members of the California Class, Plaintiff Amburgey and members of the California Class would not have purchased the Specialty Drugs, would have refused the delivery of the Specialty Drugs and/or would have paid less for the Specialty Drugs that were delivered outside of the specified temperature range.

209.   Had Plaintiff Amburgey and members of the California Class known that the Specialty Drugs provided by Caremark's specialty pharmacies may have frozen during storage or shipment, they would have not have purchased the Specialty Drugs, would have refused the delivery of the Specialty Drugs and/or would have paid less for the Specialty Drugs.

210.   Had Plaintiff Amburgey and members of the California Class known that the Specialty Drugs provided by Caremark's specialty pharmacies may have exceeded the upper limit of the specified temperatures during storage or shipment, they would have not have purchased the Specialty Drugs, would have refused the delivery of the Specialty Drugs and/or would have paid less for the Specialty Drugs.

211.   Had Plaintiff Amburgey and members of the California Class known that the Specialty Drugs provided by Caremark's specialty pharmacies may exceed the upper limit of the specified temperature ranges during storage or shipment, they would have not have purchased the Specialty Drugs, would have refused the delivery of the Specialty Drugs and/or would have paid less for the Specialty Drugs.

212.   Had Caremark disclosed to Plaintiff Amburgey and members of the California Class that it did not possess, utilize, or apply adequate policies and

1  procedures to maintain specified temperature ranges during storage or mail order

2  shipment, they would have not have purchased the Specialty Drugs, would have

3  refused the delivery of the Specialty Drugs and/or would have paid less for the

4  Specialty Drugs.

5      213.  Plaintiff Amburgey and members of the California Class deem the

6  disclosure of above-described information important in determining how to act in the

7  transactions at issue.

8      214.  Defendant has a duty to disclose the above-described information to

9  Plaintiff Amburgey and members of the California Class.   Failure to provide such

10 information could result in significant health and safety risks to Plaintiff Amburgey

11 and the California Class, resulting in them injecting and/or using Specialty Drugs that

12 are adulterated, misbranded, mutated, ineffective, or, at the very least, not approved for

13 use due to health and safety concerns.

14     215.  Moreover, Defendant had exclusive actual knowledge and actively

15 concealed and suppressed the above-described information that it was duty-bound to

16 disclose.   Plaintiff Amburgey and members of the California Class have no

17 independent means of obtaining said information.

18     216.  As a result, consumers, including Plaintiff Amburgey, reasonably

19 perceived and expected that the Specialty Drugs could be used as delivered and would

20 be free from any health or safety risks.   This perception and expectation induced

21 reasonable consumers, including Plaintiff Amburgey, to purchase Specialty Drugs

22 from Caremark, which they otherwise would not have purchased, for which they would

23 have refused delivery and/or for which they would have paid less.

24     217.  Defendant engaged in concealment designed to mislead Plaintiff

25 Amburgey and other class members into believing that the Specialty Drugs were

26 maintained, stored, dispensed and shipped at the specified temperature range and that

27 the Specialty Drugs were not adulterated, misbranded, mutated, ineffective, or

28 otherwise unapproved for use due to health and safety concerns.   As a result of

Defendant's concealment and affirmative misrepresentations, Plaintiff Amburgey and other class members did not know, and could not be expected to know through the exercise of reasonably diligence, of the health and safety risks involved in their purchase and use of the Specialty Drugs, or of Defendant's fraudulent conduct.

218.   Plaintiff Amburgey and other members of the California Class relied on Defendant's omissions and affirmative misrepresentations in failing to disclose material facts regarding the inadequate policies and procedures to maintain specified temperature ranges during storage or mail order shipment.

219.   As a direct and proximate result of Defendant's violations, Plaintiff Amburgey and members of the California Class have suffered and continue to suffer injury in fact and lose money or property as a result of Defendant's material omissions and affirmative misrepresentations.

220.   Plaintiff Amburgey, on behalf of herself and the California Class, seeks: (a) injunctive relief in the form of an order requiring Defendant to cease the acts of unfair competition alleged herein and to correct and/or enact adequate policies and procedures for filling, dispensing and shipping of Specialty Drugs, as well as appropriate warnings in conspicuous form about the shipping protocol deficiencies described within and associated risks and instructions;; (b) injunctive relief in the form of an order requiring Defendant to include a temperature indicator on Specialty Drug boxes and/or include a reusable temperature recorder; (c) restitution; (d) declaratory relief; and (e) attorney fees and costs pursuant to Cal. Code Civ. P. § 1021.5, *inter alia*.

## COUNT IV

### (Breach of Implied Warranty)

### (By Plaintiff Amburgey on Behalf of the California Class)

221.   Plaintiff Amburgey, on behalf of herself and the California Class, incorporates by reference and re-allege the preceding paragraphs.

222.   Plaintiff Amburgey brings this claim individually and on behalf of the California Class.

223.   Plaintiff Amburgey and each member of the California Class formed a contract with Defendant at the time Plaintiff Amburgey and the other members of the California Class purchased one or more of the Specialty Drugs.

224.   Caremark was and is a merchant with respect to the Specialty Drugs that are the subject of this litigation, and included in the sale to Plaintiff Amburgey and the California Class of those goods as implied warranty that those goods were merchantable.

225.   Caremark impliedly warranted that the Specialty Drugs provided by Caremark would be of merchantable quality and reasonably fit for their intended purposes and that the storage and shipment of the Specialty Drugs would be done in a careful and workmanlike manner.

226.   Caremark impliedly warranted that the Specialty Drugs dispensed, supplied and/or transported by Defendant would be of merchantable quality and reasonably fit for their intended and reasonably foreseeable uses.

227.   Plaintiff Amburgey and the California Class relied upon the implied warranties given by Caremark in obtaining Specialty Drugs from Caremark.

228.   Caremark breached the warranties implied in the sale of the Specialty Drugs in that the  Specialty Drugs dispensed, supplied, and/or transported were not maintained at the temperature range specified by the manufacturers of the Specialty Drugs and are therefore adulterated and cannot be legally dispensed or sold.

229.   As a result thereof, Plaintiff Amburgey and the California Class did not receive goods as impliedly warranted by Defendant to be merchantable.

230.   The above-referenced warranties provided by Caremark have been breached as the services Specialty Drugs cannot perform as intended and/or were not properly stored as required by the FDA, causing damage to Plaintiff Amburgey and the California Class as a result thereof.

231.   Notice of Caremark's breach of warranties has been previously provided, but Caremark has failed refused to remedy said breaches.

232.   As a result of Defendant's breaches of warranties, Plaintiff and the California Class have suffered and incurred substantial damages in specific amounts to be proven at trial.

## COUNT V

**Violations of the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18**

**(By Plaintiff Washington on Behalf of the Wisconsin Class)**

233.   Plaintiff Washington, on behalf of herself and the Wisconsin Class, incorporates by reference and re-allege the preceding paragraphs.

234.   Plaintiff Washington brings this claim individually and on behalf of the Wisconsin Class against Defendant.

235.   Plaintiff Washington and the Wisconsin Class members are members of "the public" within the meaning of Wis. Stat. § 100.18(1).  Plaintiff Washington and the Wisconsin Class members purchased Specialty Drugs.

236.   Plaintiff Washington and the Wisconsin Class members are "persons" under the Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA"), Wis. Stat. § 100.18(1).3328. Defendant is a "person, firm, corporation or association" within the meaning of Wis. Stat. § 100.18(1).

237.   The Wisconsin DTPA makes unlawful any "representation or statement of fact which is untrue, deceptive or misleading." Wis. Stat. § 100.18(1).

238.   In the course of Defendant's business, Defendant intentionally or negligently concealed and suppressed material facts concerning its failure to ensure that it maintained, stored, dispensed and shipped Enbrel at the specified temperature range and that the Specialty Drugs were not adulterated, misbranded, mutated, ineffective, or otherwise unapproved for use due to health and safety concerns. Defendant accomplished this by failing to disclose that it did not possess, utilize, or apply adequate policies and procedures to maintain specified temperature ranges during storage or mail order shipment.

239.   Plaintiff Washington and other members of the Wisconsin Class had no way of discerning, and could not, through the exercise of reasonably diligence, be expected to discern, the health and safety risks involved in their purchase and use of the Specialty Drugs, or of Defendant's fraudulent conduct.

240.   Defendant thus violated the provisions of the Wisconsin DTPA, at a minimum by at a minimum by making myriad "representation[s] or statement[s] of fact which [are] untrue, deceptive or misleading" concerning the Specialty Drugs.

241.   In the course of Defendant's business, and in connection with consumer transactions, Defendant engaged in misleading, false, unfair or deceptive acts or practices that violated the Wisconsin DTPA by failing to disclose and/or actively concealing and suppressing the above-described information that it was duty-bound to disclose.   Plaintiff Washington and members of the Wisconsin Class have no independent means of obtaining said information.

242.   Moreover, Defendant had exclusive actual knowledge, and knew that it did not possess, utilize, or apply adequate policies and procedures to maintain specified temperature ranges during storage or mail order shipment.

243.   Defendant intentionally and knowingly misrepresented material facts regarding the Specialty Drugs with the intent to mislead Plaintiff Washington and the Wisconsin Class.

244.   Defendant knew or should have known that its conduct violated the Wisconsin DTPA.

245.   Defendant owed Plaintiff Washington and members of the Wisconsin Class a duty to disclose, truthfully, all the facts concerning the policies and procedures used to maintain specified temperature ranges during storage or mail order shipment of Specialty Drugs because they:

> a.   Possessed exclusive knowledge that they were packing, storing, and shipping Specialty Drugs without possessing, utilizing, or applying adequate policies and procedures to maintain specified temperature;

      b.     intentionally concealed the foregoing from Plaintiff Washington and Wisconsin Class members; and/or

      c.     made incomplete or negligent representations about the Specialty Drugs, while purposefully withholding material facts from Plaintiff Washington that contradicted these representations.

246. Defendant engaged in concealment designed to mislead Plaintiff Washington and other members of the Wisconsin Class into believing that the Specialty Drugs were maintained, stored, dispensed and shipped at the specified temperature range and that the Specialty Drugs were not adulterated, misbranded, mutated, ineffective, or otherwise unapproved for use due to health and safety concerns.

247. The fact that the Enbrel and the other Specialty Drugs delivered to Plaintiff Washington and the Wisconsin Class may have frozen, may have been stored and/or shipped outside of the specified temperature range, and that Defendant does not have adequate policies and procedures to store and distribute Specialty Drugs in the specified temperature range is material because Plaintiff Washington and members of the Wisconsin Class. A Specialty Drug that is kept within its specified temperature range is worth more than an otherwise comparable drug that is not.

248. Defendant's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Washington and other members of the Wisconsin Class about the inadequate policies and procedures to maintain specified temperature ranges during storage or mail order shipment.

249. Plaintiff Washington and other members of the Wisconsin Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's misrepresentations and its concealment of and failure to disclose material information. Plaintiff Washington and the Wisconsin Class members who purchased the Specialty Drugs, would have acted differently, including, but not limited to: (1) purchasing a

competing product instead of the Specialty Drugs; (2) selecting the Specialty Drugs from a different source; and/or (3) paying less for the Specialty Drugs.

250.   Defendant had an ongoing duty to Plaintiff Washington and the Wisconsin Class to refrain from unfair and deceptive practices under the Wisconsin DTPA in the course of its business.

251.   Defendant's violations present a continuing risk to Plaintiff Washington and the members of the Wisconsin Class, as well as to the general public.  Defendant's unlawful acts and practices complained of herein affect the public interest.

252.   Plaintiff Washington and the Wisconsin Class seek damages, court costs and reasonable attorneys' fees and costs under Wis. Stat. § 100.18(11)(b)(2), and any other just and proper relief available under the Wisconsin DTPA.

**COUNT VI**

**Breach of Implied Warranty of Merchantability,**

**Wis. Stat. § 402.314**

**(By Plaintiff Washington on Behalf of the Wisconsin Class)**

253.   Plaintiff Washington, on behalf of herself and the Wisconsin Class, incorporates by reference and re-allege the preceding paragraphs.

254.   Plaintiff Washington brings this claim individually and on behalf of the Wisconsin Class against Defendant.

255.   Defendant is and was at all relevant times a "merchant" under Wis. Stat. § 402.104(3) and a "seller" under § 402.103(1)(d).

256.   The Specialty Drugs are and were at all relevant times "goods" within the meaning of Wis. Stat. § 105(1)(c).

257.   A warranty that the Specialty Drugs were in merchantable condition and fit for the ordinary purpose for which they are used is implied by law pursuant to Wis. Stat. § 402.314.

258.   These Specialty Drugs, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which drugs are used.

259.   Specifically, the Specialty Drugs are inherently defective in that they do not comply with the requirements specified by the FDA and the manufacturers for the Specialty Drugs.

260.   Defendant was provided notice of these issues by complaints filed against it including the instant Complaint, and by a letter sent by Plaintiff Washington on February 1, 2017 and received by Defendant on February 6, 2017.

261.   As a direct and proximate result of the Defendant's breach of the implied warranty of merchantability, Plaintiff Washington and the other Wisconsin Class members have been damaged in an amount to be proven at trial.

## COUNT VII

### Strict Products Liability—Manufacturing Defect

### (By Plaintiff Amburgey in Her Individual Capacity Only)

262.   Plaintiff Amburgey incorporates by reference and re-alleges the preceding paragraphs.

263.   Defendant Caremark manufactured, distributed, stored or sold the Enbrel and Orencia purchased and used by Plaintiff Amburgey.

264.   The Enbrel and Orencia were defective when they left Caremark's possession.

265.   Plaintiff Amburgey used the Enbrel and Orencia in the manner intended by Caremark, or in a reasonably foreseeable manner.

266.   As a direct and legal result of the manufacturing defects, Plaintiff Amburgey was harmed, in that the Enbrel and Orencia did not function as intended. Plaintiff's symptoms from her Rheumatoid Arthritis reappeared and were unabated, and she suffered from physical and emotional pain and distress. She further experienced progression of her disease that would not have occurred had the Orencia

and Enbrel arrived free of defects. Finally, as a result of the aforementioned defects in the Orencia and Enbrel, Plaintiff Amburgey experienced an infection that required surgery on her knee.

267.   As a direct and legal result of the manufacturing defects, Plaintiff Amburgey suffered medical expenses and other special (economic) damages in an amount according to proof.

268.   As a direct and legal result of the manufacturing defects, Plaintiff Amburgey suffered emotional and physical pain and distress, all to her general damage in an amount according to proof.

269.   Each manufacturing defect was a substantial factor in causing Plaintiff Amburgey's harm.

## COUNT VIII

### Strict Products Liability—Failure to Warn

### (By Plaintiff Amburgey in Her Individual Capacity Only)

270.   Plaintiff Amburgey incorporates by reference and re-alleges the preceding paragraphs.

271.   Caremark manufactured, distributed, stored or sold the Enbrel and Orencia purchased and used by Plaintiff Amburgey.

272.   Caremark knew or should have known in light of the scientific and medical knowledge that was generally accepted in the scientific community at the time of the manufacture, distribution, storage and sale, that Enbrel and Orencia had potential risks or side effects if the temperature of the Enbrel and Orencia was not maintained within the required temperature range during storage and distribution.

273.   The potential risks or side effects presented a substantial danger when Enbrel is used or misused in an intended or reasonably foreseeable way.

274.   Ordinary consumers would not have recognized the potential risks.

275.   Caremark failed to adequately warn or instruct of the potential risks or side effects resulting from the degradation caused by their failure to maintain Enbrel

and Orencia within the required temperature range throughout the manufacturing, distribution, storage and/or sale process.

276.   As a direct and legal result of the failure to warn, Plaintiff Amburgey was harmed, in that the Enbrel and Orencia did not function as intended. Plaintiff Amburgey's symptoms from her Rheumatoid Arthritis reappeared and were unabated, and she suffered from physical and emotional pain and distress. She further experienced progression of her disease that would not have occurred had the Orencia and Enbrel arrived free of defects. Finally, as a result of the aforementioned defects in the Orencia and Enbrel, Plaintiff Amburgey experienced an infection that required surgery on her knee.

277.   As a direct and legal result of the failure to warn, Plaintiff Amburgey suffered medical expenses and other special (economic) damages in an amount according to proof.

278.   As a direct and legal result of the failure to warn, Plaintiff Amburgey suffered emotional and physical pain and distress, all to her general damage in an amount according to proof.

279.   The lack of sufficient instructions or warnings was a substantial factor in causing Plaintiff Amburgey's harm.

## COUNT IX

### Negligence

### (By Plaintiff Amburgey in Her Individual Capacity Only)

280.   Plaintiff Amburgey re-alleges and incorporates by reference the preceding paragraphs.

281.   Caremark manufactured, distributed, stored or sold the Enbrel and Orencia purchased and used by Plaintiff Amburgey.

282.   Caremark failed to use that amount of care in said design, manufacture, distribution, storage, supply and/or inspection of Enbrel and Orencia that a reasonably

careful designer, manufacturer, distributor, supplier, and/or inspector would use in similar circumstances to avoid exposing others to a foreseeable risk of harm.

283.   As a direct and legal result of Caremark's negligence, Plaintiff Amburgey was harmed, in that the Enbrel and Orencia did not function as intended. Plaintiff Amburgey's symptoms from her Rheumatoid Arthritis reappeared and were unabated, and she suffered from physical and emotional pain and distress. She further experienced progression of her disease that would not have occurred had the Orencia and Enbrel arrived free of defects. Finally, as a result of the aforementioned defects in the Orencia and Enbrel, Plaintiff Amburgey experienced an infection that required surgery on her knee.

284.   As a direct and legal result of Caremark's negligence, Plaintiff Amburgey suffered medical expenses and other special (economic) damages in an amount according to proof.

285.   As a direct and legal result of Caremark's negligence, Plaintiff Amburgey suffered emotional and physical pain and distress, all to her general damage in an amount according to proof.

286.   Caremark's negligence was a substantial factor in causing Plaintiff Amburgey's harm.

## COUNT X

### Negligent Failure to Warn

### (By Plaintiff Amburgey in Her Individual Capacity Only)

287.   Plaintiff Amburgey re-alleges and incorporates by reference the preceding paragraphs.

288.   Caremark manufactured, distributed, stored or sold the Enbrel and Orencia purchased and used by Plaintiff Amburgey.

289.   Caremark knew or reasonably should have known that the Enbrel and Orencia were dangerous or ineffective or were likely to be dangerous or ineffective when used or misused in a reasonably foreseeable manner.

290.   Caremark knew or reasonably should have known that the users would not realize the danger or ineffectiveness.

291.   Caremark failed to adequately warn of the danger or ineffectiveness or instruct on the safe and effective use of the product.

292.   A reasonable manufacturer, distributor and/or seller under the same or similar circumstances would have warned of the danger or ineffectiveness or instructed on the safe and effective use of the product.

293.   As a direct and legal result of Caremark's negligent failure to warn, Plaintiff Amburgey was harmed, in that the Enbrel and Orencia did not function as intended. Plaintiff Amburgey's symptoms from her Rheumatoid Arthritis reappeared and were unabated, and she suffered from physical and emotional pain and distress. She further experienced progression of her disease that would not have occurred had the Orencia and Enbrel arrived free of defects. Finally, as a result of the aforementioned defects in the Orencia and Enbrel, Plaintiff Amburgey experienced an infection that required surgery on her knee.

294.   As a direct and legal result of Caremark's negligent failure to warn, Plaintiff Amburgey suffered medical expenses and other special (economic) damages in an amount according to proof.

295.   As a direct and legal result of Caremark's negligent failure to warn, Plaintiff Amburgey suffered emotional and physical pain and distress, all to her general damage in an amount according to proof.

296.   Caremark's negligent failure to warn was a substantial factor in causing Plaintiff Amburgey's harm.

## <u>COUNT XI</u>

### Strict Products Liability—Manufacturing Defect

### (By Plaintiff Washington in Her Individual Capacity Only)

297.   Plaintiff Washington incorporates by reference and re-alleges the preceding paragraphs.

298.   Defendant Caremark manufactured, distributed, stored or sold the Enbrel purchased and used by Plaintiff Washington.

299.   The Enbrel was defective when they it Caremark's possession.

300.   Plaintiff Washington used the Enbrel in the manner intended by Caremark, or in a reasonably foreseeable manner.

301.   As a direct and legal result of the manufacturing defects, Plaintiff Washington was harmed, in that the Enbrel did not function as intended. Plaintiff Amburgey's symptoms from her Rheumatoid Arthritis reappeared and were unabated, and she suffered from physical and emotional pain and distress. She further experienced progression of her disease that would not have occurred had the Enbrel arrived free of defects.

302.   As a direct and legal result of the manufacturing defects, Plaintiff Washington suffered medical expenses and other special (economic) damages in an amount according to proof.

303.   As a direct and legal result of the manufacturing defects, Plaintiff Washington suffered emotional and physical pain and distress, all to her general damage in an amount according to proof.

304.   Each manufacturing defect was a substantial factor in causing Plaintiff Washington's harm.

## COUNT XII

### Strict Products Liability—Failure to Warn

### (By Plaintiff Washington in Her Individual Capacity Only)

305.   Plaintiff Washington incorporates by reference and re-alleges the preceding paragraphs.

306.   Caremark manufactured, distributed, stored or sold the Enbrel purchased and used by Plaintiff Washington.

307.   Caremark knew or should have known in light of the scientific and medical knowledge that was generally accepted in the scientific community at the time of the

manufacture, distribution, storage and sale, that Enbrel had potential risks or side effects if the temperature of the Enbrel was not maintained within the required temperature range during storage and distribution.

308.   The potential risks or side effects presented a substantial danger when Enbrel is used or misused in an intended or reasonably foreseeable way.

309.   Ordinary consumers would not have recognized the potential risks.

310.   Caremark failed to adequately warn or instruct of the potential risks or side effects resulting from the degradation caused by their failure to maintain Enbrel within the required temperature range throughout the manufacturing, distribution, storage and/or sale process.

311.   As a direct and legal result of the failure to warn, Plaintiff Washington was harmed, in that the Enbrel did not function as intended. Plaintiff's symptoms from her Rheumatoid Arthritis reappeared and were unabated, and she suffered from physical and emotional pain and distress. She further experienced progression of her disease that would not have occurred had the Enbrel arrived free of defects.

312.   As a direct and legal result of the failure to warn, Plaintiff Washington suffered medical expenses and other special (economic) damages in an amount according to proof.

313.   As a direct and legal result of the failure to warn, Plaintiff Washington suffered emotional and physical pain and distress, all to her general damage in an amount according to proof.

314.   The lack of sufficient instructions or warnings was a substantial factor in causing Plaintiff Washington's harm.

## COUNT XIII

### Negligence

### (By Plaintiff Washington in Her Individual Capacity Only)

315.   Plaintiff Washington re-alleges and incorporates by reference the preceding paragraphs.

316.   Caremark manufactured, distributed, stored or sold the Enbrel purchased and used by Plaintiff Washington.

317.   Caremark failed to use that amount of care in said design, manufacture, distribution, storage, supply and/or inspection of Enbrel that a reasonably careful designer, manufacturer, distributor, supplier, and/or inspector would use in similar circumstances to avoid exposing others to a foreseeable risk of harm.

318.   As a direct and legal result of Caremark's negligence, Plaintiff Washington was harmed, in that the Enbrel did not function as intended. Plaintiff Washington's symptoms from her Rheumatoid Arthritis reappeared and were unabated, and she suffered from physical and emotional pain and distress. She further experienced progression of her disease that would not have occurred had the Enbrel arrived free of defects.

319.   As a direct and legal result of Caremark's negligence, Plaintiff Washington suffered medical expenses and other special (economic) damages in an amount according to proof.

320.   As a direct and legal result of Caremark's negligence, Plaintiff Washington suffered emotional and physical pain and distress, all to her general damage in an amount according to proof.

321.   Caremark's negligence was a substantial factor in causing Plaintiff Washington's harm.

## COUNT XIV

### Negligent Failure to Warn

### (By Plaintiff Washington in Her Individual Capacity Only)

322.   Plaintiff Washington re-alleges and incorporates by reference the preceding paragraphs.

323.   Caremark manufactured, distributed, stored or sold the Enbrel purchased and used by Plaintiff Washington.

324.   Caremark knew or reasonably should have known that the Enbrel was dangerous or ineffective or were likely to be dangerous or ineffective when used or misused in a reasonably foreseeable manner.

325.   Caremark knew or reasonably should have known that the users would not realize the danger or ineffectiveness.

326.   Caremark failed to adequately warn of the danger or ineffectiveness or instruct on the safe and effective use of the product.

327.   A reasonable manufacturer, distributor and/or seller under the same or similar circumstances would have warned of the danger or ineffectiveness or instructed on the safe and effective use of the product.

328.   As a direct and legal result of Caremark's negligent failure to warn, Plaintiff Washington was harmed, in that the Enbrel did not function as intended. Plaintiff Washington's symptoms from her Rheumatoid Arthritis reappeared and were unabated, and she suffered from physical and emotional pain and distress. She further experienced progression of her disease that would not have occurred had the Enbrel arrived free of defects. Finally, as a result of the aforementioned defects in the Enbrel, Plaintiff Washington experienced an infection that required surgery on her knee.

329.   As a direct and legal result of Caremark's negligent failure to warn, Plaintiff Washington suffered medical expenses and other special (economic) damages in an amount according to proof.

330.   As a direct and legal result of Caremark's negligent failure to warn, Plaintiff Washington suffered emotional and physical pain and distress, all to her general damage in an amount according to proof.

331.   Caremark's negligent failure to warn was a substantial factor in causing Plaintiff Washington's harm.

## **PRAYER FOR RELIEF**

Plaintiffs, on behalf of themselves and the Class, pray for relief as follows:

1.     For an order certifying that the action may be maintained as a class action for Counts I through VI and appointing Plaintiffs and their undersigned counsel to represent the Class in this litigation;

2.     For an order declaring that the acts and practices of Defendant constitute violations of Cal. Bus. & Prof. Code § 17200 *et seq.*, Cal. Civ. Code § 1750 *et seq.* and Wis. Stat. § 100.18;

3.     For actual and statutory damages;

4.     For restitution;

5.     For a permanent injunction enjoining Defendant from continuing to harm Plaintiffs and members of the Class and the public, and violating California and Wisconsin law in the manners described above;

6.     For reasonable attorneys' fees and the costs of the suit; and

7.     For all such other relief as this Court may deem just and proper and may be available at law or equity.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand trial by jury of all claims so triable.

ZIMMERMAN REED, LLP

Dated: October 5, 2017          By:     /s/ Caleb Marker
                                        Caleb Marker
                                        caleb.marker@zimmreed.com

                                        2381 Rosecrans Ave., Suite 328
                                        Manhattan Beach, CA 90245
                                        Tel. (877) 500-8780
                                        Fax (877) 500-8781

                                        *Attorneys for Plaintiffs*